**Anthony N. ROBINSON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 98–CM–1204.**

District of Columbia Court of Appeals.

Argued Feb. 29, 2000.
Decided June 5, 2003.

Karla–Dee Clark, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher and Carmen Kelley, Assistant United States Attorneys, were on the brief for appellee.

Before TERRY, RUIZ and GLICKMAN, Associate Judges.

RUIZ, Associate Judge:

Anthony N. Robinson was convicted of one count of threatening another person in violation of D.C.Code § 22–507 (1996) based on a May 22, 1997, telephone conversation that appellant had with his former girlfriend, Tracey Marie Adams, while he was incarcerated at the Lorton Correctional Complex.

On appeal, Robinson contends that the government had an obligation to preserve and produce Lorton's recording of the telephone conversation, and that its failure to do so constituted a due process violation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), violated the Jencks Act, 18 U.S.C. § 3500, and breached the discovery requirements of Superior Court Criminal Rule 16. He argues that the trial court, which found that the government had violated its Jencks obligation, should have dismissed the information or, in the alternative, imposed a more severe sanction on the government than the one it chose. We agree with the trial court's determination that there was a Jencks violation. Given the trial court's choice of sanction, on the facts of record we are constrained to reverse the judgment of conviction and remand with instructions that the case be dismissed.

## I. Facts

At trial, Ms. Adams testified that she and appellant had a romantic relationship beginning in April 1996, when she lived with her aunt. That summer she decided

George E. Rickman, appointed by this court, for appellant.

to end the relationship because she became afraid of appellant, and she moved to live with her mother to avoid the continual calls and threats appellant had been making while she was at her aunt's home. Some months later, Ms. Adams tried to reconcile with appellant after he agreed to stop being abusive. Within about one month, however, she again ended the relationship.

The following year, on May 22, 1997, the phone rang several times at her mother's home, but Ms. Adams initially did not answer because the telephone caller identification box displayed "Lorton format"—an indication that the call originated from the Lorton Correctional Facility—and she knew it would be appellant. Appellant called several more times before she answered the phone.

The first time Ms. Adams answered the telephone, she stated that she was cooking breakfast and would not accept the call, and hung up. The next time she answered the phone, appellant said, "bitch, I'm gone [sic] to fuck you up" and "bitch, I'm going to kill you." Ms. Adams understood the first statement as a threat that he was going to beat her up; the second one needs no interpretation.

Ms. Adams immediately reported the incident to the Metropolitan Police Department and Officer Gomez responded the same day. While Officer Gomez was with Ms. Adams at her mother's home, the telephone rang, and Ms. Adams informed Officer Gomez that she knew it was appellant because the caller identification box indicated that the call originated from Lorton. With her permission, Officer Gomez answered the telephone and accepted the

charges. Ms. Adams did not speak to appellant or listen during that telephone call. Appellant was arrested on a bench warrant on June 30, 1997, some five weeks after Officer Gomez responded to Ms. Adams's complaint and took appellant's call from Lorton.

Ms. Adams was the sole government witness at trial; neither party called Officer Gomez. Ms. Adams testified that from her experience telephone calls originating at Lorton are collect, the recipient must accept the charges for the call to go through, and a recorded message announces that the telephone conversation is being recorded. Appellant presented no evidence but cross-examined Ms. Adams in an attempt to show that her testimony was incredible because she testified that she wanted to end her relationship with appellant, yet had sought to reconcile with him even after the threatening call. In closing, defense counsel argued for acquittal because Ms. Adams was the only witness who testified about the threatening phone call and the trial court had agreed to draw a negative inference from the government's failure to preserve the tape of the call.

## II. The Trial Court's Rulings

Two months before trial, defense counsel sought a continuance in order to obtain the tape recording of the call which formed the basis for the threats charge. When the government did not produce the tape, appellant filed a motion to dismiss or for sanctions, claiming that the government had failed in its duty to preserve the tape recording made by the corrections facility. After a pretrial hearing,[1] the trial court

1. At the pretrial hearing, defense counsel asserted that telephone calls from Lorton are recorded and the tapes held for thirty days, and that a person who receives a call from Lorton is told that the conversation will be recorded. There was no evidence presented about the administration of the tapes at Lorton, under what circumstances telephone calls are recorded, how long they are kept, and when they are destroyed or turned over

ruled that because appellant had not shown that the government's failure to preserve the tape was in bad faith, there was no due process violation, and dismissal of the information was not warranted. It further found that the routine taping of inmates' conversations at Lorton did not convert the Department of Corrections into an investigative agency of the United States, and that appellant was not prejudiced by the destruction of the tape because he could not show it was exculpatory. The trial court deemed that Rule 16 of the Criminal Rules of Superior Court was inapplicable because the tape was "not procured through an interrogation or through police investigative reports." It reserved ruling on appellant's claim that the government had breached its obligation under the Jencks Act, 18 U.S.C. § 3500.

After the government rested at trial, the court considered the Jencks Act claim and ruled that there was a violation. The court explained in its ruling that, while the Department of Corrections was not an investigative agency, so that the obligation to preserve information did not apply to the Department generally, under the facts of this case the conversation was "within the purview of the government." Specifically, "the police officer had an obligation in the Court's mind to attempt to go the extra mile, to get that particular tape [from the agency] and preserve it" because

the Court, based on the testimony of Ms. Adams, [found] that the police knew or should have known and therefore, prob-

ably had an obligation [ ] to preserve testimony to get a copy of that tape. The Court does not consider[ ] the tape to have been destroyed or the Government to have failed to preserve the evidence. But the Court does consider that it is missing evidence that the Government had the ability to recover.

... [T]he Government failed to produce that tape when there is testimony that, in fact, the police knew or should have known that was taped.

As a sanction for the government's violation of the Jencks Act, the court said it would apply "all inferences from that missing evidence against the Government." The trial court then expressly credited Ms. Adams's testimony, found appellant guilty of threatening Ms. Adams during the telephone call, and sentenced him to six months imprisonment.

### III. Analysis

■ Appellant's legal arguments all stem from facts not in dispute: that appellant's phone conversation with Ms. Adams, which originated from Lorton, was recorded, and that the tape was destroyed after thirty days or so by the Department of Corrections—all in the routine course of business.[2] Appellant argues that the failure of the government to preserve this tape violated his right to due process under *Brady v. Maryland*, the Jencks Act, and the government's discovery obligations under Superior Court Criminal Rule 16. He argues that the trial court erred by not dismissing the information or imposing se-

to the police for further investigation. Defense counsel argued further:

All conversations coming out of Lorton are taped for security reasons. However, they don't reserve the tapes unless specifically requested or there's something that the drug and addiction task and some other law enforcement authority wishes to look at further.

So, there are procedures in place which would allow for the government to obtain or preserve any tapes.

The government did not dispute appellant's assertions at trial, and does not contest them on appeal.

**2.** See *supra* note 1 and accompanying text.

vere enough sanctions on the government for failing to obtain and preserve the tape. We address each argument in turn.

## A. Due Process

Appellant asserts that the government violated his Fifth Amendment right to due process by failing to properly investigate the crime and retrieve the most direct evidence of the threatening call: the tape recording made by the Department of Corrections in the normal course of its business. Appellant argues that since Officer Gomez responded to the complaint on the same day the threatening conversation was alleged to have occurred, and since he answered the phone at Ms. Adams's home when appellant called, he knew or should have known, as the trial court found, that appellant's calls from Lorton were recorded. He further argues that Officer Gomez, and, by extension, the government, had a duty to retrieve the tape from the Department of Corrections in the course of the investigation, and that the government had plenty of time in which to do so before it was destroyed.

The Supreme Court in *Brady* held that the Due Process Clause imposes on the prosecution an affirmative duty to disclose exculpatory information to the defense. Under *Brady*, suppression of evidence material to either guilt or punishment, whether or not there is bad faith on the part of the government, constitutes a due process violation. *See* 373 U.S. at 87, 83 S.Ct. 1194. We have defined *"Brady* material" as "exculpatory information, material to a defendant's guilt or punishment, which the government knew about but failed to disclose to the defendant in time for trial." *Coleman v. United States,* 515 A.2d 439, 446 (D.C.1986). (quoting *Lewis v. United States,* 393 A.2d 109, 114 (D.C.1978), *aff'd after rehearing,* 408 A.2d 303 (D.C.1979)). This case does not present the classic *Bra-*

*dy* situation involving information in the hands of prosecutors which they do not have an incentive to divulge. *See United States v. Brooks,* 296 U.S.App. D.C. 219, 221, 966 F.2d 1500, 1502 (1992). Here, the prosecutors never heard the tape and, therefore, could not have known whether the recording would have been exculpatory.

The government asserts that the duty to disclose information under *Brady* does not include a duty to investigate the records of the Department of Corrections. *See Lewis v. United States,* 393 A.2d 109, 115 (D.C.1978) ("The Brady principle does not imply a prosecutor's duty to investigate—and come to know—information which the defendant would like to have but the government does not possess."); *Levin v. Katzenbach,* 124 U.S.App. D.C. 158, 162, 363 F.2d 287, 291 (1966) ("[W]e do not suggest that the government is required to search for evidence favorable to the accused."). However, the *Brady* doctrine requiring disclosure of exculpatory information has been extended to situations where a division of the police department not involved in a case has information that could easily be found by the prosecutors if they sought it out, *see Brooks,* 296 U.S.App. D.C. at 221, 966 F.2d at 1502, and there is a duty to search branches of government "closely aligned with the prosecution," *id.* at 222, 966 F.2d at 1503 (citation omitted). This court has never been confronted with the question whether *Brady* requires the government to search the records of other branches of government, such as the Department of Corrections, where the government is presumed to know they contain material information.

▆ Although we analyze that question in connection with appellant's Jencks and Rule 16 claims, we need not decide it to reject his claim under *Brady.* Appellant alleges, but cannot demonstrate, any prej-

udice to his case. We do not know whether the tape would have been exculpatory; indeed, appellant does not assert that it would have been. There is no *Brady* violation absent a showing of materiality, *i.e.,* that the missing evidence "would have made a different result reasonably probable." *Farley v. United States,* 694 A.2d 887, 889 (D.C.1997) (citing *Kyles v. Whitley,* 514 U.S. 419, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

In *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court held that in cases where the exculpatory value of the evidence is unknown, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. 333; *accord United States v. Day,* 697 A.2d 31, 35–36 (D.C.1997). The Court refused to impose an "undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." 488 U.S. at 58, 109 S.Ct. 333. Instead, the Court required the defendant to make a showing of bad faith on the part of the police in order to "limit[ ] the extent of the police's obligation to preserve evidence to reasonable bounds and confine[ ] it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.*

█ The trial court in this case applied the rule in *Youngblood* when it expressly permitted appellant to explore in a pretrial evidentiary hearing whether there was any bad faith by the government. Once the trial court found that appellant failed to demonstrate bad faith by the government in not obtaining and preserving the tape recording, the trial court denied appellant's motion to dismiss the information. "[W]e will not disturb a trial court's factual finding[ ], such as the court's determination in this case that the police did not act in bad faith," unless the finding is "plainly wrong or without facts to support [it]." *Davis v. United States,* 641 A.2d 484, 494 (D.C.1994); *see* D.C.Code § 17–305 (1997). Although the trial court found that Officer Gomez "knew or should have known" that appellant's telephone call to Ms. Adams was recorded, that finding, without more, is not enough to undermine the trial court's ultimate finding that the government's failure to obtain and preserve the tape recording was not in bad faith.

**B. Jencks Act and Rule 16**

█ Appellant asserts that the trial court erred by failing to recognize the extent of the government's gross negligence in not preserving the tape in violation of the Jencks Act and Superior Court Criminal Rule 16, and by refusing to dismiss the information or strike the complaining witness's testimony as a sanction for the government's violation. As the complaining witness's testimony about the telephone call was the sole evidence on which the threats conviction was based, striking her testimony would necessarily result in dismissal.

Rule 16 provides that the government shall provide, as discovery, "any relevant written or recorded statements made by the defendant within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government." Super. Ct. Crim. R. 16(a)(1)(A).[3] The Jencks Act re-

---

**3.** Superior Court Criminal Rule 16(a)(1)(A) (2000) provides in full:

quires that once a government witness has testified on direct examination, on defendant's motion, the government must disclose "any statement [as defined in the Act] of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b);[4] *see Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); *Davis*, 641 A.2d at 489 ("After a government witness has testified at trial an accused has the right, pursuant to the Jencks Act, to review any prior statements by that witness that are within the government's control and are relevant to the witness' direct testimony . . . ."). The tape in question, because it recorded a conversation between the defendant and the prosecution's only witness at trial, is potentially subject to disclosure under both Rule 16 and the Jencks Act.

■■ To be subject to disclosure under Rule 16 and Jencks, the defendant must request the statements, which must be within the possession of the government.[5] In addition, the Jencks Act requires that the requested material be a "statement" under the Act and that the statement relate to the subject matter of the witness's direct testimony. *See Frye v. United States*, 600 A.2d 808, 810 (D.C.1991) (quoting *Butler v. United States*, 481 A.2d 431,

446 (D.C.1984), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985)). There is no question in this case that the defendant requested the recording[6] or that the tape would have been highly relevant to the complaining witness's direct testimony. Two questions remain: whether the tape recording made by the Department of Corrections was in the "possession" of the government for both Jencks and Rule 16 purposes, and whether the recording was the sort of "statement" contemplated by the Jencks Act.

### 1. Was the recording in the possession of the government?

The government acknowledges that its disclosure obligation extends beyond statements held in the prosecutor's office to statements in the possession of its investigative agencies. As with the due process claim, however, the government asserts that the Department of Corrections is not an investigative agency for this purpose.

■■ "[T]he duty of disclosure affects not only the prosecutor, but 'the government as a whole, including its investigative agencies,' because the Jencks Act refers to evidence gathered by 'the government,' and not simply that held by the prosecution." *Wilson v. United States*, 568 A.2d

---

Upon request of a defendant the attorney for the government must disclose to the defendant and make available for inspection, copying, or photographing: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government

**4.** The District of Columbia implements the Jencks Act through Superior Court Criminal Rule 26.2 (2000):

Motion for Production. After a witness other than the defendant has testified on

direct examination, the Court, on motion of a party who did not call the witness, shall order the prosecutor or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

**5.** Rule 16 refers to "possession, custody or control;" the Jencks Act requires "possession."

**6.** By the time the tape recording was requested, it presumably had been destroyed by Lorton officials.

817, 820 (D.C.1990) (quoting *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971) (*"Bryant I "*), *on remand*, 331 F.Supp. 927, *aff'd*, 145 U.S.App. D.C. 259, 448 F.2d 1182 (1971) (*"Bryant II "*)). In *Wilson* we applied *Brady* and *Jencks* requirements to the Washington Metropolitan Area Transit Authority (WMATA), where WMATA police were involved in the investigation and the case arose out of an attempt to enforce WMATA regulations. 568 A.2d at 819–21; *see also Morris v. Washington Metro. Area Transit Auth.*, 251 U.S.App. D.C. 42, 44, 781 F.2d 218, 220(1986) (when the Metro Transit Police are involved, WMATA is considered a governmental entity); *Bryant I*, 142 U.S.App. D.C. at 140, 439 F.2d at 650 (tape recordings in the possession of the Bureau of Narcotics and Dangerous Drugs are in the possession of the government). Appellant urges that the Corrections Department should similarly be considered part of the government for disclosure purposes.

The case before us does not require that we go that far. This case presents a narrower issue: whether the government has a duty to preserve evidence obviously material which, as the trial court found, the police knew or should have known about, and could have obtained if requested promptly from another government agency. In *Brooks*, the Court of Appeals explained courts' willingness to insist on an affirmative duty of inquiry on the part of the prosecutor, because an "inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure." *See Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503

(citing as an example *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975) (en banc) (reflecting concern for "inherent fairness")). *Brooks* dealt with information that was already in the hands of the police department, albeit in a different unit than the one that investigated the case, and the law is clear that information in the hands of the police department is considered to be held by the "government" for *Brady* purposes. *See Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding prosecutor's *Brady* obligation to disclose exculpatory evidence to defense applies to facts known to anyone acting on the government's behalf, including the police).

■ The government distinguishes *Brooks* arguing that the tape recording at issue in this case was made and held by another agency, the D.C. Department of Corrections, which, although closely allied with the U.S. Attorney's Office and the Metropolitan Police Department, has never been determined to be part of "the government" for *Brady* purposes. The government further argues that in *Johnson v. United States*, 336 A.2d 545, (D.C. 1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976), this court expressly found that the Department of Corrections is not an investigative arm of the United States government and, therefore, cannot be held to the duty of preservation that would apply to a qualified investigative agency.[7] Whatever the merits of the government's contention, *but cf. United States v. Butler*, 163 U.S.App. D.C. 1, 3, 499 F.2d 1006, 1008 (1974) (noting that while the "obligation of investigative agencies [ ] cannot be applied unqualifiedly" to jail authorities, "for they cannot reason-

---

7. Although in *Johnson* we did not "strictly apply" to the Corrections Department those obligations attendant to investigative agencies, we imposed on Lorton "a reasonably high degree of care in establishing and ad-

ministering a filing system for the safekeeping of its records and in providing reasonable security to protect the integrity of the system." 336 A.2d at 548.

ably be held to have construed these obligations of establishing preservation procedures as intended for them as well as investigative agencies, ... there [is] a general obligation upon the custodial authorities to preserve evidence obtained by them which might be relevant and material to the case"), we need not decide it in this case, for our focus here is not on Lorton officials, but on the police, which we already have recognized forms an integral part of the prosecution team. Even when the prosecutor does not know about certain evidence, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555. We are unpersuaded by the government's argument that, by the time the offense was charged or the defense made a request for the recording, the tape in all likelihood had been destroyed, because "before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation. Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later." *Bryant I,* 142 U.S.App. D.C. at 140, 439 F.2d at 650; *see Butler,* 163 U.S.App. D.C. at 3, 499 F.2d at 1008 (quoting *Bryant I* ). If that duty of preservation had been met during the investigation, the duty of disclosure could have been fulfilled by the prosecutor. The trial court found, and the record supports, that the police officer who responded to the complaint knew or should have known on the day of the alleged crime that appellant's telephone call from Lorton, during which, the complainant alleged, appellant threatened to beat her up and kill her, had been recorded by Lorton authorities.[8] Appellant argued to the trial court that, on request to the Department of Corrections made within thirty days of the call, the police could have obtained the recording, but did not.[9] The government does not contend otherwise. Under these circumstances, we agree with the trial court that the police, as an integral part of the prosecution team, had an obligation to secure the tape recording. Thus, the tape recording was in the government's "possession" for both Jencks and Rule 16 purposes.

### 2. Was the recording a Jencks "statement"?

A "statement" is defined in the Jencks Act as "a stenographic, mechanical, electrical, or other recording, ... which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e)(2).[10] "To be a statement within the statute, the transcription 'must be a continuous, narrative recording rather than mere selective notations or excerpts from the oral statements.' " *Simms v. United States,* 634 A.2d 442, 447 n. 3 (D.C. 1993) (quoting *Moore v. United States,* 353 A.2d 16, 18 (D.C.1976)) (rejecting police notes as Jencks material which were "selective notations from the interview, rather than a continuous narrative recording").

---

8. Ms. Adams testified that she told Officer Gomez she knew from the telephone caller ID box that appellant's calls to her home were coming from Lorton. She also testified that calls from Lorton are preceded by a message played to the recipient explaining that the call will be recorded.

9. See *supra* note 1 and accompanying text.

10. Under the Superior Court rules, a "statement" is "a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof." SUP. CT. CRIM. R. 26.2(f)(2) (2000).

We have assumed, for example, that 911 tapes fall within the Act's definition of "statements." *See Bartley v. United States,* 530 A.2d 692, 697 n. 10 (D.C.1987); *see Slye v. United States,* 602 A.2d 135, 138 n. 6 (D.C.1992). Here, there is no dispute that the tape recording would have been a verbatim, continuous, contemporaneous recording of the conversation between appellant and the complaining witness.

▆▆▆▆ Citing the Seventh Circuit's decision in *United States v. Sopher,* the government argues that the tape recording of the telephone call is not a Jencks "statement" because it was direct evidence of the charged offense and not a "recorded recital of past occurrences made by a prospective prosecution witness." ˙362 F.2d 523, 525 (7th Cir.1966). We are unpersuaded by the conclusory disposition in *Sopher* that a Jencks statement "[f]rom its very nature, [is] necessarily [one] made after those events have taken place." *Id* at 525.[11] The government gives no explanation for that position. We find no support for such a narrow reading in the language of the Jencks Act, nor do we think any such limitation is expressed or implied by the policy underlying the Act, which is to prevent the possibility that "disclosure might be avoided by destroying vital evidence, before prosecution begins or before defendants hear of its existence."

*Woodall v. United States,* 684 A.2d 1258, 1265 (quoting *Montgomery v. United States,* 384 A.2d 655, 662 (D.C.1978)). To the contrary, we think the limitation is contrary to the purpose of the Jencks Act, which was designed to "safeguard the fairness of criminal trials by providing defendants with appropriate tools for cross-examination." *Davis,* 641 A.2d at 489. With prior statements of the government witness, the defense can test the accuracy of the witness's in-court testimony. *See Wilson,* 568 A.2d at 819. The recording of the statements Ms. Adams made during her telephone call with appellant could have been used to test the accuracy of her in-court testimony about the threatening nature of the call—just as any statement of a prior occurrence relevant to her trial testimony. It is difficult to conceive of more relevant or powerful impeachment than one that goes to the heart of the witness's testimony directly inculpating the defendant. Therefore, we conclude that the fact that the recorded statement at issue is of the telephone call on which the threats charge was based does not exclude it from disclosure under Jencks.[12]

## C. Sanction

We are bound by the holding in *Bryant I,* and follow its reasoning here. *See M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971). In *Bryant I,* a case with facts remarkably

**11.** In *Sopher* the court refers to the prosecutor's duty to disclose a statement when the prosecutor calls a witness to the stand "in reliance on [that] statement." 362 F.2d at 525. That is but one example of a situation when a recorded statement is relevant to trial testimony, but it does not define the universe of relevant statements, nor would it necessarily exclude a recording of the charged offense.

**12.** In dicta one other circuit has adopted, without elucidation, the 7th Circuit's "past occurrence" requirement. *See United States v. Skillman,* 442 F.2d 542, 553 (8th Cir.1971) (citing *Sopher* ) (holding that recorded conver-

sation was not producible under Jencks Act, since recording was not relevant to government witness's trial testimony and not a recital of past occurrences). *But cf. United States v. Crisona,* 416 F.2d 107, 113 (2d Cir.1969) (citing *Sopher* and noting, without holding, that its opinion in *United States v. Birnbaum,* 337 F.2d 490 (2d. Cir.1964), "clearly looks the other way"). The D.C. Circuit has noted but not reached the reading of the Jencks Act in *Sopher,* while rejecting a similar narrow reading of Rule 16. *See Bryant I,* 142 U.S.App. D.C. at 140, 439 F.2d at 650.

similar to the case at bar, appellant challenged his conviction for offenses involving the sale of a substantial quantity of heroin, in which the principal witness was an undercover agent of the Bureau of Narcotics and Dangerous Drugs. The drug transactions between Bryant and the agent were recorded on audio tapes which Bryant repeatedly requested pre-trial, but were eventually determined to have been lost. At trial, the government relied almost exclusively on the testimony from memory of the undercover agent, so that Bryant's guilt heavily depended on the agent's recounting of their conversations. *See* 142 U.S.App. D.C. at 135, 439 F.2d at 645.

Considering the government's disclosure obligation under *Brady*, Jencks and Rule 16, the *Bryant I* court recognized that "an exception will be made for good faith loss," but imposed a "heavy burden" on the government to explain the loss of evidence,

holding that sanctions "will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation." *Id.* at 141, 142, 439 F.2d at 651, 652.[13] It placed the burden squarely on the government to make this showing, and held that "negligent failure to comply with the required procedures" would provide no excuse. *Id.* In establishing this rule, the court particularly noted that the good faith exception would not cover "administrative decisions that certain evidence is not discoverable and thus need not be preserved," and exhorted investigative agencies to define discoverable evidence very broadly in establishing their rules, and to ensure the rules covered both Jencks Act and Rule 16 materials.[14] *Id.* at 142 n. 21, 439 F.2d at 652 n. 21.

**13.** To the extent the decision in *Bryant I* also included *Brady* claims, we are governed by the Supreme Court's ruling in *Youngblood*, discussed *supra*, which requires bad faith on the part of the government before the trial court will impose sanctions for missing evidence. See *supra* section III. A.

**14.** In direct response to *Bryant*, the Metropolitan Police Department issued instructions to members of the department on "Preservation of Potentially Discoverable Material" requiring the preservation of all materials "which may reasonably be expected to be relevant in a criminal judicial proceeding" for a period of three years. *See Montgomery*, 384 A.2d at 662 n. 6. The order states that members of the department "shall preserve all potentially discoverable material, including any such material which might prove favorable to an accused." *See* Metropolitan Police Department, General Order No. 601.2, pt. I(A) (Jun. 24, 1983). It specifically includes in the definition of "potentially discoverable material"

2. [a]ny stenographic, mechanical, electrical, or other recording … which is a substantially verbatim recital of an oral statement made by a prospective witness or defendant which is recorded contemporaneously with such oral statement ….

6. All other materials which reasonably may be expected to be relevant in a criminal judicial proceeding. Any doubt as to whether a particular item may be relevant and therefore preservable shall be resolved in favor of preservation pursuant to the terms of this order.

*Id.*, pt. I(B). The order provides that where no judicial proceeding is initiated, material shall be preserved for three years from the date obtained with the exception of Communications Division magnetic radio recording tapes, which are kept for two years. All 911 tapes are retained for one year. *See id.*, pt. I(C). Had the tape recording at issue in this case been preserved when made in 1997 as required by the MPD Order, it would have been available for disclosure when requested by defense counsel before trial the following year, and the government would have met its Jencks obligation. Although we do not have "direct supervisory authority on such day-to-day law enforcement activities," *see March v. United States*, 362 A.2d 691, 698 n. 8 (D.C. 1976), "all such rules will be subject to review of their adequacy to the assigned task" of preserving material subject to disclosure. *Bryant I*, 142 U.S.App. D.C. at 142, 439 F.2d at 652. "[W]e intend to ensure that rights

Since *Bryant*, we similarly have held that the government violates its duty to preserve evidence when evidence is lost or destroyed as a result "of either negligence or purposeful destruction accompanied by either bad motive or bad judgment." *Bartley*, 530 A.2d at 697 (quoting *United States v. Perry*, 153 U.S.App. D.C. 89, 99, 471 F.2d 1057, 1067 (1972)); *Woodall*, 684 A.2d at 1265.

 Although *Bryant I* required that sanctions be imposed even in cases of negligent loss of evidence, we have since held that "a violation of the duty to preserve which results in the loss of discoverable statements does not automatically require the imposition of sanctions." *McGriff v. United States*, 705 A.2d 282, 287 (D.C.1997) (quoting *Slye*, 602 A.2d at 138). For over thirty years since the Supreme Court's decision in *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), the rule has been that "the administration of the Jencks Act must be entrusted to the 'good sense and experience' of the trial judges subject to 'appropriately limited review of appellate courts.' " *Id.* at 355, 89 S.Ct. 528 (quoting *Palermo v. United States*, 360 U.S. 343, 353, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959)). Even though the Jencks Act provides specific sanctions (striking witness's testimony or mistrial) when the statement of a witness is not produced, 18 U.S.C. § 3500(d), the choice of a sanction is within the trial court's discretion, as is the decision whether to impose any sanction at all. *See McGriff*, 705 A.2d at 287. Similarly, once a violation of the discovery rules is found,

the trial court has discretion to choose among a broad range of sanctions, "the only real limitation being that a sanction must be just under the circumstances." *Davis v. United States*, 623 A.2d 601, 605 (D.C.1993) (internal quotation omitted).[15]

 "In fashioning the appropriate sanction, the court should weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice." *Woodall*, 684 A.2d at 1265 (Jencks) (citation omitted); *see Perry*, 153 U.S.App. D.C. at 100, 471 F.2d at 1063 (fact that transcript of testimony of witness given before grand jury has been lost by reporting service and, therefore, cannot be produced by government, does not necessarily require that witness be prohibited from testifying at trial). Similarly, when evidence producible under Rule 16 has been lost, the trial court determines whether sanctions must be imposed by evaluating "(1) the circumstances occasioning the loss; (2) systematic steps taken toward preservation; and (3) the magnitude of demonstrated evidentiary materiality." *Brown v. United States*, 372 A.2d 557, 560–61 (D.C.1977).

 Here, although the trial court found no bad faith on the part of the government, it did find that Officer Gomez knew or should have known of the existence of the recording, and had time to retrieve it. Since Officer Gomez was not called to testify, the record is devoid of information about his motives (if any) with

---

recognized at one stage of the criminal process will not be undercut at other, less visible, stages." *Id.*

15. Superior Court Criminal Rule 26.2(e) provides:

*Sanction for failure to produce statement.* If the other party elects not to comply with an order to deliver a statement to the moving party, the Court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the prosecutor that elects not to comply, shall declare a mistrial if required by the interest of justice.

regard to his failure to obtain the tape. Nor is there any indication as to the reasons for the delay in arresting and charging appellant, who was identified to police on the day of the offense—a delay which effectively precluded the possibility that appellant could obtain the tape recording. The government only tells us that "[a]rguably, the tape was destroyed prior to the arrest warrant being issued for appellant, the United States Attorney's office becoming aware of its possible existence, and the filing of the information charging threats." This is insufficient to overcome the implication that the government was at least negligent in failing to secure the tape recording.[16] The government was afforded the opportunity but failed to carry its "heavy burden" to explain the failure to secure and preserve the tape recording so it could comply with its duty of disclosure. Thus, the record fully supports the trial court's determination to sanction the government for its Jencks violation.

 We take no issue with the trial judge's choice of sanction, but with its implementation. The trial court stated its intention, as the lone trier of fact in this case, to draw "all inferences from that missing evidence against the government." Such a strong sanction was appropriate given the degree of governmental fault, the potential importance of the missing recording for resolving the complaining witness's credibility on whether appellant threatened her, and the fact that the complainant's uncorroborated testimony was the sole evidence of appellant's guilt. *See Woodall,* 684 A.2d at 1265. The lost tape recording was of the conversation on which the threats charge was based, and therefore "absolutely crucial" to guilt or innocence, either corroborating the testimony of the government's only witness or completely undercutting the government's case. *Bryant I,* 142 U.S.App. D.C. at 137–38, 439 F.2d at 647–48. In these circumstances, we think that having chosen to draw "all inferences" against the government from the failure to produce the tape recording of the conversation, the trier of fact erred in nonetheless crediting the uncorroborated testimony of the complaining witness beyond a reasonable doubt.[17] Without that testimony, appellant's conviction cannot stand and we must reverse. We remand with instructions that the trial judge dismiss the case because a new trial could not remedy the government's nondisclosure where the lost recording could have been used to impeach the government's "most important witness[ ]." *United States v. Ramirez,* 174 F.3d 584, 589 (5th Cir.1999).[18] *Cf. Woodall,* 684 A.2d at

**16.** A misdemeanor offense like this, where the complaining witness and accused were immediately ascertained, did not require lengthy investigation prior to charging by information. In addition, there was no difficulty in locating appellant to arrest him, as he was known to be incarcerated at Lorton.

**17.** In a jury trial, the court might have sanctioned the government by striking the complainant's testimony (and necessarily dismissing the case), or perhaps by instructing the jury that *if it chose* it could draw adverse inferences from the government's failure to disclose the tape. In such a case where the jury would not have been required to draw "all inferences" against the government, the appellant might not be entitled to reversal depending on the degree of the government's fault or whether there was additional evidence of guilt.

**18.** In *Ramirez,* a Fifth Circuit case similar to the one at bar, a prison informant provided updates on impending heroin smuggling transactions to a prison supervisor in conversations routinely taped and subsequently routinely destroyed by the Bureau of Prisons. The informant and supervisor were key to the government's prosecution of the drug smuggling. Following *Bryant I,* the Court of Appeals held that the trial court erred in finding that the prison's tapes were not in the possession of the United States, *see* 174 F.3d at 588,

1265 (refusing to require that officer's testimony be stricken where government's loss of PD–47 was negligent—but not grossly negligent—and trial court found no prejudice because at trial there were "other sources of the same information").

*So ordered.*

and in excusing the government's failure to produce the tapes due to its good faith oversight or negligence, *see id* at 589. The case was remanded for a determination as to whether the government intentionally or negligently lost the tapes. *See id.* If the court found that the tapes were destroyed *either* intentionally *or* negligently, the Fifth Circuit instructed that the trial court was required to dismiss defendant's indictment.