*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CO-0745

KEVIN M. BELLINGER, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2000-FEL-006204)

(Hon. Russell F. Canan, Trial Judge)

(Argued November 17, 2022                    Decided May 25, 2023)

*Michael J. Anstett*, with whom *Karen T. Grisez* was on the brief, for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time, *Elizabeth Trosman*, *Elizabeth H. Danello*, *Diane Lucas*, *James Sweeney*, and *Patricia A. Heffernan*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY, DEAHL, and ALIKHAN, *Associate Judges*.

DEAHL, *Associate Judge*: Kevin Bellinger was convicted of assault with intent to kill while armed and related offenses connected to the shooting of Lorraine Jackson. After Bellinger was convicted, he learned of ballistics evidence suggesting that the same gun used to shoot Jackson had been used in a homicide six weeks later

in the same neighborhood. Based on this new evidence, Bellinger challenged his conviction under D.C. Code § 23-110, arguing that the government had violated its *Brady* obligations by failing to turn over the ballistics evidence. He also contended that his trial lawyer, Phyllis Baron, effectively knew of the ballistics match and provided ineffective assistance of counsel when she failed to use it to advance a third-party perpetrator defense at trial. The trial court rejected those arguments and Bellinger now appeals. We affirm.

## I.

*The Jackson shooting*

Jackson was a paid police informant who provided information about various crimes in the 18th and D Streets Northeast area. In May 2000, Jackson called the police to report that Bellinger and a friend were playing with guns in front of a building on the 400 block of 18th Street Northeast. When the police arrived, Bellinger and his friend fled, but Jackson did not. When Bellinger returned, Jackson thought he seemed suspicious about the fact that she had not fled, which made her nervous.

Two days later, in the early hours of the morning, Jackson purchased some crack cocaine and was on her way to a friend's house to smoke it. As she walked down an alley leading to the home's back entrance, the following sequence of events happened (according to Jackson's testimony): Jackson saw someone walking toward her but could not tell who it was at first, because the alley was poorly lit. She soon recognized the person as Bellinger because of his build and his walk. She also saw his face when he passed under a streetlight in the middle of the alley. Jackson knew Bellinger well. She had known him for years—he had even lived with her for six months—and she testified that she recognized him "just like I know my own child." When Bellinger was about six feet away from Jackson, he pulled out a gun and repeatedly shot her. Jackson turned around to run and fell to the ground. She was hit by six bullets in her arm, legs, neck, and back. As Bellinger was leaving, Jackson shouted after him, "That's all right. At least I know who you are." The police arrived shortly afterward and Jackson was taken to the hospital.

*Bellinger's trials and conviction*

Bellinger was arrested and charged with assault with intent to kill while armed, possession of a firearm during the commission of a crime of violence or

dangerous offense, carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition.

Bellinger was tried three times, with the first two trials ending in hung juries. At Bellinger's first trial, in May 2001, the jury was deadlocked at 6-6. The Public Defender Service (PDS) attorney who was representing him withdrew after the trial, in September 2001, because of an unspecified conflict of interest, and the trial judge appointed Phyllis Baron as counsel. Bellinger was tried again in February 2002. That trial also ended in a mistrial, with the jury voting 10-2 for acquittal.

Bellinger, still represented by Baron, was tried a third time in April 2002. The government argued that Bellinger had shot Jackson because she had reported him to the police two days earlier. Bellinger's defense was that Jackson had misidentified him based on a quick interaction in a poorly lit alley, and he called three alibi witnesses who testified that they had seen Bellinger outside of a club at the time Jackson was shot. At this third trial, the jury convicted Bellinger of all five counts, and he received an aggregate sentence of 20 years to life. Bellinger appealed, and we affirmed his convictions.

*The ballistics evidence*

Several months after the third trial but before sentencing, Bellinger fired Baron and retained Jenifer Wicks as counsel. Wicks filed an ex parte motion seeking access to certain firearm and ballistics evidence from the Metropolitan Police Department (MPD). She represented that Bellinger's PDS counsel had withdrawn after the first trial because "the defense had learned" that a gun recovered from another PDS client, Randall Mack, and linked to a homicide of a man named Deyon Rivers "should match" the gun used to shoot Jackson.[1] Wicks proffered that the two shootings were six weeks apart, in the same neighborhood, and that Mack was acquainted with Jackson and knew she was a police informant. Therefore, she argued, a ballistics match would have enabled Bellinger to advance a third-party perpetrator defense, *see Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (en banc), implicating Mack as the person who had shot Jackson.

---

[1] Wicks herself came to learn of this ballistics match from one of her clients, Mack's codefendant in the Rivers homicide case, who had brought an ineffective assistance of counsel case against her, thereby waiving his attorney-client privilege and enabling Wicks to speak publicly about what she had learned from discussions with him. *See Andrews v. United States*, 179 A.3d 279, 292 (D.C. 2018).

The trial court granted that motion and ordered MPD to make the firearm and ballistics evidence from the two cases available to Bellinger in August 2002. The government did not turn over that evidence until September 2006, more than four years later. By that time, Wicks had been replaced by attorneys at Fried, Frank, Harris, Shriver & Jacobson, LLP, who were appointed as pro bono counsel and who represent Bellinger in this appeal. Bellinger's firearms expert examined the evidence and, in a report issued in November 2006, opined that the same firearm used to shoot Jackson had also been used in Rivers's murder.

*Bellinger's motion to vacate his conviction*

Five years after that report was issued, in November 2011, Bellinger filed a motion for a new trial under D.C. Code § 23-110, the District's collateral review statute. Bellinger argued that the government had failed to disclose the exculpatory ballistics evidence in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). While Bellinger did not contend that anybody in the government had been aware of the ballistics match at the time of the trials, he argued that there were sufficient clues that the two shootings were connected such that the government should have investigated the possibility of a ballistics match. Their failure to do so

and to turn over evidence of the ballistics match that they should have found, he argued, violated *Brady*.

On similar grounds, Bellinger argued that his trial counsel had rendered ineffective assistance. To support this claim, Bellinger argued that Baron knew of a potential ballistics match and that her decision not to investigate this lead further, and not to present a *Winfield* defense blaming Mack for the shooting, was objectively unreasonable. He further argued that, had Baron presented that defense, there was a reasonable probability he would not have been convicted. The government countered that it could have met any *Winfield* defense with powerful rebuttal evidence that both Bellinger and Mack were affiliated with the 18th and D Street crew, whose members shared guns. That meant, in the government's view, that it was a reasonable strategic decision for Baron not to present a *Winfield* defense because it was unlikely to succeed and it would have opened the door to this damaging evidence. Without holding an evidentiary hearing, the trial court summarily denied Bellinger's motion. Bellinger appealed.

This court remanded for the trial court to hold a hearing on Bellinger's ineffective assistance claim. *Bellinger v. United States*, 127 A.3d 505, 509 (D.C. 2015) (reaffirming that § 23-110 litigants are entitled to a hearing unless their claims

(1) are palpably incredible; (2) are vague and conclusory; or (3) even if true, do not entitle them to relief). We directed the court on remand to focus on the credibility of Bellinger's assertions that Baron had known about the ballistics match and on what admissible evidence the government could have used to rebut a *Winfield* defense. *Id.* at 519. We determined there was no abuse of discretion in the trial court's denial of the *Brady* claim because Bellinger had not alleged that the government actually knew of the ballistics match. *Id.* at 520-21. We nonetheless directed the trial court to allow Bellinger to conduct limited discovery on this issue and to reconsider the *Brady* claim if Bellinger found evidence that the government actually knew of the match. *Id.* at 523.

*The evidentiary hearing*

After further discovery, the trial court held an evidentiary hearing in December 2018. Bellinger called three witnesses: Wicks, Bellinger's previous counsel who had first requested that the MPD turn over the ballistics information; Detective Norma Horne, one of the four police officers who had investigated the Jackson shooting; and Bellinger himself. Bellinger also introduced an affidavit from the court-appointed investigator who had worked with Baron on Bellinger's case.

The investigator stated that, other than serving subpoenas, he did not perform any investigative work on the case.

Detective Horne testified that she was part of a "core group" of four officers who focused on crime in the area of 18th and D Streets. Because she worked on non-homicide shootings, whereas homicides were handled by a different division, Horne had worked on the Jackson investigation but not on the Rivers case. Horne believed that, due to the high volume of shootings in the District, it was MPD policy not to run ballistics comparisons between two shootings unless there was specific reason for the police to suspect there might be a match. In a sworn affidavit, Horne also stated that she was not aware that any ballistics comparison had been run on the ballistics evidence from the Jackson shooting.

Wicks testified that she had been aware of a potential ballistics match between the gun used in the Jackson shooting and the Rivers homicide, and that Baron had been aware of this match too. Specifically, Wicks testified that when she took over Bellinger's case from Baron in June 2002, after his convictions, she met with Baron so that Baron could hand over her case files. At that meeting, Baron told Wicks that she was aware of the ballistics match. Wicks did not inquire further about when Baron had found out about the match or how she had found out about it.

Bellinger likewise testified that Baron had been aware of a potential ballistics match and had informed him about it. According to Bellinger, Baron told him she had spoken to the government and had filed a motion with the court requesting the ballistics evidence, but the court had denied the motion. Bellinger later found out that none of this was true. On the basis of this evidence, Bellinger renewed his ineffective assistance claim against Baron and amended his *Brady* claim to argue that the government not only should have but in fact *must* have known of the ballistics match, given the quantum of evidence pointing to that conclusion.

The government, in addition to disputing those arguments, highlighted evidence that it could have introduced to rebut a *Winfield* defense. Specifically, the government proffered that it could have linked Bellinger to the 18th and D Street crew and that it could have presented officer testimony that the crew was violent and kept a shared stash of guns. The government pointed to materials seized from Bellinger's room, including a poster that depicted guns, contained a violent poem referencing putting people "in they grave quicker!" and said "18-N-Dst N.E.," seeming to reference the crew. The government also noted that Bellinger had acknowledged that he was in the area "all the time" and that he had friends in the crew. And Detective Horne's testimony established that members of the crew shared guns. Additionally, the government noted that Mack was a poor third-party

perpetrator candidate because he was committed to a juvenile detention center in Pennsylvania called Terraces at the time Jackson was shot. Though Mack was occasionally allowed weekend visits to the District, it was quite unlikely he was on such a visit when Jackson was shot in the early morning hours of a Friday, undermining any *Winfield* defense Baron could have advanced.

The government also argued that Bellinger's ineffective assistance claim should be dismissed under D.C. Code § 23-110's laches provision, which permits a court to dismiss a petitioner's claim if their delay in bringing it materially prejudiced the government. Bellinger's ballistics expert had connected the firearms used in the Jackson shooting and the Rivers homicide in 2006, but Bellinger did not file his § 23-110 claim until 2011. In 2009, in the midst of that five-year delay, two important events happened: (1) Baron died, and (2) Terraces closed down and its records—which might have indicated whether or not Mack was detained when Jackson was shot—were subsequently lost. The government argued that these events impeded its ability to rebut Bellinger's ineffective assistance claim, so that claim should be dismissed under D.C. Code § 23-110(b)(2), the statute's laches provision.

*The trial court denies Bellinger's motion*

The trial court rejected both of Bellinger's claims.  On his *Brady* claim, the court credited Detective Horne's testimony that the government had not known of any ballistics match before Bellinger's trial and that it was MPD policy not to run ballistics comparisons absent a specific reason to do so.  On this basis, the court found that Bellinger had not provided evidence that the government actually knew of, or should have investigated and uncovered, the potential ballistics match.

The trial court also denied Bellinger's ineffective assistance claim.  The court first reasoned that dismissal was warranted under § 23-110's laches provision because the government was materially prejudiced by Bellinger's delay in filing his motion.  In particular, the court concluded that "the government [could not] now determine whether Baron made a tactical decision in deciding not to pursue a *Winfield* defense" and could no longer use the Terraces records to show conclusively that Mack was detained in Terraces on the day of the shooting, which would have undercut a *Winfield* defense.

The trial court further concluded that, even if it were to reach the merits of Bellinger's ineffective assistance claim, the claim would fail.  It found Bellinger's testimony that Baron knew of the ballistics match and lied to him about asking for

the government to turn over the ballistics evidence "wholly incredible."  And, though it found Wicks credible, it found her testimony did not establish that Baron had known of the ballistics match *before* Bellinger's trial because Baron told Wicks she knew of the match around two months *after* the trial concluded.  Without knowing what exactly Baron knew, and when she knew it, the court concluded it could not find her representation deficient.  In any case, the court reasoned, Bellinger would not have been prejudiced by any deficiency because evidence of his guilt was "unusually strong," the government had powerful evidence that Bellinger was part of a violent crew that shared weapons, and Mack was likely detained at the time of the shooting, meaning it was unlikely the jury would have been persuaded by a *Winfield* defense.  The court therefore again denied Bellinger's motion to vacate his conviction.  Bellinger now appeals.

## II.

Bellinger argues that the trial court erred in denying both of his claims.  He argues, first, that the government violated its *Brady* obligations because it knew or should have known about the ballistics match and did not disclose it to the defense.  Second, he argues that Baron provided ineffective assistance of counsel by failing

to investigate and present a *Winfield* defense, despite her awareness of a potential ballistics match.

As a threshold matter, we note that both of Bellinger's claims are premised on the dubious proposition that there is now admissible evidence of a ballistics match between the gun used in the Jackson and Rivers shootings. In *Gardner v. United States*, we established that "in this jurisdiction a firearms and toolmark expert may not give an unqualified opinion, or testify with absolute or 100% certainty, that based on ballistics pattern comparison matching a [] shot was fired from one firearm, to the exclusion of all other firearms." 140 A.3d 1172, 1184 (D.C. 2016). We have since clarified that we have not foreclosed "all firearms and toolmark evidence," but rather such evidence that "unqualifiedly connects a specific bullet to a specific gun." *Williams v. United States*, 210 A.3d 734, 742-43 (D.C. 2019). With that said, the government does not dispute that, at the time, Bellinger could have introduced the purported ballistics match evidence developed post-trial to effectively establish that the same gun was used in the Jackson and Rivers shootings. While that proposition seems to contravene our later decision in *Gardner*, the parties agree that there is now admissible evidence establishing that the same gun was used in the Jackson and Rivers shootings, so we take that point as undisputed and adopt the parties' shared locution of referring to a "ballistics match."

Starting from that premise, we reject both of Bellinger's arguments. Bellinger has not cured the defects in his *Brady* claim that we noted in our 2015 decision and so his arguments are foreclosed by that decision. Bellinger also has not met his burden of proving that Baron's representation of him was objectively unreasonable.

**A.**

Bellinger first argues that the government violated its *Brady* obligations when it failed to disclose evidence of the ballistics match. Because Bellinger has not shown that the government actually knew of the match—or that it failed to "turn over an easily turned rock" when it failed to uncover it, *see United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992)—we disagree.

The court in *Brady* recognized the government's constitutional obligation "to disclose to the defense, prior to trial, information in the government's actual or constructive possession that is favorable and material" to the defense. *Vaughn v. United States*, 93 A.3d 1237, 1244 (D.C. 2014). "If the government does not possess the requested information, there can be no *Brady* violation," *Bellinger*, 127 A.3d at 521 (quoting *Guest v. United States*, 867 A.2d 208, 212 (D.C. 2005)), though the possession prong of *Brady* may be satisfied where the government is in constructive possession of the information and is willfully blind to it. *Id.* at 520 n.49; *see also*

*Brooks*, 966 F.2d at 1503.  Ultimately, *Brady* "does not imply the government's duty to investigate—and come to know—information which the defendant would like to have but the government does not possess."  *Bellinger*, 127 A.3d at 521 (quoting *Guest*, 867 A.2d at 212).

In our 2015 opinion, we affirmed the trial court's rejection of Bellinger's *Brady* claim because Bellinger had asserted only that the government should have discovered the ballistics match—not that it actually knew of such a match or was willfully blind to one.  *Id.* at 520 & n.49.  In the absence of actual knowledge or willful blindness, we held, there was no *Brady* violation.  *Id.* at 521.  We left open the opportunity, however, for Bellinger to conduct limited discovery specifically requesting information about any ballistics match that the government had actually possessed.  *Id.* at 522-23.

After additional discovery, Bellinger still has not produced any evidence showing that the government had actual or constructive knowledge of the ballistics match.  At the evidentiary hearing following our 2015 remand, Detective Horne stated that she was not aware of any ballistics comparison having been run and believed it was in fact MPD policy not to run ballistics comparisons unless there was a specific reason to do so.  The trial court credited that testimony.

Bellinger's alternative argument is that the government was willfully blind to the ballistics match, but that overstates the evidence. Bellinger argues that the government should have known there could be a match because the two shootings happened in the same neighborhood, six weeks apart, and were linked to members of the same crew. But this is not the type of "government[] failure to turn over an easily turned rock" that we have said can support a *Brady* violation. *Vaughn*, 93 A.3d at 1258 (quoting *Brooks*, 966 F.2d at 1503). We have typically found that willful blindness to evidence amounted to constructive possession where the exculpatory evidence was held by a government agency other than the prosecution. *See id.* (prosecution deemed to possess evidence held by Department of Corrections); *Robinson v. United States*, 825 A.2d 318, 328 (D.C. 2003) (same). And while MPD was in possession of ballistics evidence in the Rivers homicide that was later "matched" to the ballistics evidence in the Jackson shooting, we cannot say that the government's failure to proactively compare the ballistics to uncover a "match" before Bellinger's trial amounted to willful blindness.

In reality, it is the ballistics comparison that was potentially exculpatory (the ballistics evidence from the Rivers homicide itself was only exculpatory once tied to Jackson's shooting). No comparison had been performed until Bellinger's post-trial counsel commissioned one. Thus, Bellinger faults the government not for

failing to disclose exculpatory evidence in its possession, but for failing to develop additional evidence. As we already explained in the prior appeal, this amounts to requiring the government to "come to know [] information which the defendant would like to have but the government does not possess," which we have said is not required under *Brady*.[2] *Bellinger*, 127 A.3d at 521 (quoting *Guest*, 867 A.2d at 212). We therefore reject Bellinger's renewed *Brady* claim.

**B.**

Bellinger next argues that Baron, his trial counsel for the second and third trials, provided him ineffective assistance. The government disputes this and further argues that Bellinger's claim is time-barred by § 23-110's laches provision because he waited five years to bring his claim. We agree with the trial court that Bellinger has not shown that Baron's representation of him was deficient and therefore reject

---

[2] This is admittedly a judgment call based on the particular facts of this case. If the police had more specific reason to believe that the Jackson shooting and the Rivers homicide were linked, it might have amounted to willful blindness for the government not to conduct a ballistics comparison. However, on the facts presented here, where there is no suggestion that there was a common suspect between the two shootings, and the shootings were committed six weeks apart, the government's failure to conduct a ballistics comparison between the two shootings simply does not rise to the level of willful blindness.

his ineffective assistance claim.  Before we turn to the merits, we flag two threshold disputes between the parties, though we ultimately do not resolve either of them.

First, the government argues that Bellinger's delay in bringing this claim materially prejudiced it, so that the trial court acted within its discretion when it dismissed his motion under the so-called laches provision, § 23-110(b)(2), permitting dismissal where "the government demonstrates that it has been materially prejudiced in its ability to respond to the motion by the delay in its filing."  It may be that the government was prejudiced, but it is difficult to attribute all of the prejudice to Bellinger where the government itself took four years (from 2002 to 2006) to comply with the Superior Court's order directing it to turn over the ballistics evidence.  That unexplained contributory delay perhaps should have been held against the government, as Bellinger has argued, and defeated the government's laches defense.  The trial court's failure to even consider that argument might amount to an abuse of discretion.  *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019) (asking "whether the decision maker failed to consider a relevant factor" when assessing a claimed abuse of discretion (citation omitted)).

Second, there is the question of whether Baron knew of the ballistics match before Bellinger's third trial (the second trial at which she represented him).  The

trial court credited Wicks's testimony that Baron knew of the match a couple of months after Bellinger's third trial concluded, but reasoned that this did not conclusively establish that Baron had known of the match before that trial. It seems to us that the trial court likely erected too high an evidentiary bar for Bellinger on this point. While it is true that Bellinger did not have ironclad proof that Baron knew of the match before trial, he needed to prove the facts underlying his ineffective assistance claim only by a preponderance of the evidence, *see Benitez v. United States*, 60 A.3d 1230, 1235 (D.C. 2013). It seems probable that Baron learned of the match in the course of representing Bellinger in the lead-up to two trials, rather than in the narrow window thereafter, at least in the absence of any evidence to the contrary.

We ultimately need not resolve these two threshold questions because, even assuming that we would resolve both of them in Bellinger's favor and treat Bellinger's motion as timely and Baron's pretrial knowledge of the ballistics match as established, Bellinger still is entitled to no relief.

To show ineffective assistance of counsel, Bellinger must show (1) that Baron's performance "fell below an objective standard of reasonableness," measured against "prevailing professional norms," and (2) "that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 690, 694 (1984). Both prongs of *Strickland* are mixed questions of law and fact, so we accept the trial court's findings of fact unless they lack evidentiary support in the record, and we review the trial court's legal determinations de novo. *Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc). We conclude that Bellinger has not shown that Baron's representation was unreasonable, and so we do not reach the question of prejudice.

Under the reasonableness prong, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. When assessing reasonableness, we make "every effort . . . to eliminate the distorting effects of hindsight" and endeavor to "evaluate the conduct from counsel's perspective at the time." *Id.* "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation omitted). In short, counsel are given a "wide latitude . . . in making tactical decisions." *Id.* at 689. This "presumptive deference" to tactical decisions does not apply, however, to

"decisions that are inexcusably uninformed or under-informed." *Cosio*, 927 A.2d at 1123. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

Baron's decision not to advance a *Winfield* defense, pointing to Mack as the true perpetrator, was a reasonable one. It was a treacherous defense to advance, even if armed with evidence that the same gun was used in the Jackson and Rivers shootings. For one thing, it seems exceedingly likely that Mack was detained at Terraces at the time of the shooting, which would have been fatal to any argument that Mack shot Jackson. While Bellinger acknowledges that Mack was detained at Terraces during the relevant timeframe, he contends that Mack was permitted weekend visits to the District that could have provided him an opportunity to shoot Jackson. The difficulty with that argument is that the evidence showed that Mack's weekend visits began on Fridays, and Jackson was shot around 2:40 am on a Friday morning. Assuming that juvenile detainees are not transported to weekend visits in the wee hours of the morning, this means Mack's weekend visit would have to have started, at the latest, on Thursday for him to be in the District when Jackson was shot. Though Mack was sometimes able to extend his weekend visits, it appears these extensions had to be approved by the court. For instance, there are records of

the court granting Mack an extension of one weekend visit so he could attend a court hearing in the District on a Monday. Though the Terraces records were lost, the Superior Court records pertaining to Mack's commitment survived, and there is no record of a court order granting an extended weekend visit for the day Jackson was shot. All evidence therefore indicates Mack was detained at Terraces at the time of the shooting. This would have made any *Winfield* defense pointing to him as the perpetrator quite tenuous, and perhaps entirely foreclosed.

Presenting a *Winfield* defense also would have opened the door for the government to introduce damaging rebuttal evidence linking Bellinger to the 18th and D Street crew and to guns, which could have been devastating to his defense. In particular, the government argued that it would have introduced various firearm ads that Bellinger had in his room along with a poster that depicted guns, contained a violent poem referencing putting people "in they grave quicker," and said "18-N-Dst N.E.," seeming to reference the crew. The government also could have introduced officer testimony that the crew kept stashes of firearms in common locations that they would share to try to stymie police efforts to tie any particular firearm to any one owner.

Bellinger does not dispute that a *Winfield* defense would have opened the door to the above evidence. Rather, he argues that there was reason to believe it would not have swayed the jury, because the first jury heard that he had prior convictions involving drug-dealing and guns, but still did not convict him.[3] But there is a substantial difference between dealing drugs and possessing guns generally, versus being a member of a violent crew that uses a shared stash of guns to commit crimes, as the latter far more directly undermines a *Winfield* defense implicating a fellow member of the same crew. And, in any case, defense counsel is entitled to decide among multiple reasonable defense theories. *See Strickland*, 466 U.S. at 689 (there is a "wide range of reasonable professional assistance"). A defense attorney could quite reasonably have concluded that the potential upside of presenting a *Winfield* defense was outweighed by the risks. Indeed, at the evidentiary hearing, Wicks agreed she would want to keep the evidence of Bellinger's affiliation with the 18th and D Street crew, and his apparent affinity for firearms, away from a jury if she were representing him.

---

[3] He also argues that the fact that the crew kept a shared stash of firearms increases the likelihood that someone else could have shot Jackson, undermining the government's case. But that would have done nothing to undermine the government's case where the government relied on Jackson's eyewitness identification of Bellinger to prove that he was the shooter and never suggested that Bellinger had exclusive access to the gun used in the shooting. Instead, this evidence would have devastated a potential *Winfield* defense without any concomitant damage to the government's case.

Moreover, it appears that Bellinger—contrary to the trial court's reasoning that the government had an "unusually strong" case—himself had a reasonably strong case without risking the introduction of that potentially damaging *Winfield* rebuttal evidence. Significantly, his first two trials had resulted in hung juries, with the second trial, at which Baron represented him, resulting in a jury hung 10-2 for acquittal. Clearly, several jurors did not believe Jackson's testimony that she was able to reliably identify Bellinger as the person who shot her. It was not unreasonable to think that Bellinger's misidentification defense—including his alibi witnesses and his impeachment of Jackson—gave him a better chance at securing an acquittal than a tenuous third-party perpetrator defense that would have opened the floodgates to testimony that would have been extremely damaging to Bellinger. We therefore think Baron's decision not to present a *Winfield* defense was a reasonable one.

## III.

For the foregoing reasons, we affirm the trial court's decision.

*So ordered.*