# District of Columbia
# Court of Appeals

**No. 13-CO-252**

KEVIN M. BELLINGER,



Appellant,

v.                                          **FEL-6204-00**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: Washington, Chief Judge; Glickman, Associate Judge; and Farrell, Senior Judge.

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the matter on appeal is remanded for the trial court to hold an evidentiary hearing on the appellant's ineffective assistance of counsel claim, and for other further proceedings consistent with this opinion.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: November 25, 2015.

Opinion by Associate Judge Stephen Glickman.

Concurring opinion by Senior Judge Michael W. Farrell.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CO-252

KEVIN M. BELLINGER, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 11/25/15
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(FEL-6204-00)

(Hon. Russell F. Canan, Trial Judge)

(Argued February 12, 2015                    Decided November 25, 2015)

*Michael J. Anstett*, with whom *Douglas W. Baruch* was on the brief, for appellant.

*Stephen F. Rickard*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, and *James Sweeney*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, GLICKMAN, *Associate Judge*, and FARRELL, *Senior Judge*.

Opinion for the court by *Associate Judge* GLICKMAN.

Concurring opinion by *Senior Judge* FARRELL at page 38.

GLICKMAN, *Associate Judge*: Appellant was convicted of assault with intent to kill while armed and four firearm offenses,[1] all arising from the shooting of Lorraine Jackson on May 26, 2000. This court affirmed his convictions on direct appeal in 2007, in an unpublished decision.[2] Now before us is appellant's appeal from the summary denial of his post-conviction motion alleging ineffective assistance of counsel and *Brady*[3] violations as grounds for granting him a new trial pursuant to D.C. Code § 23-110 (2012 Repl.). We remand for an evidentiary hearing on appellant's ineffective assistance claim and otherwise affirm the trial court's rulings, but without prejudice to appellant's submission of a renewed, narrower request to take discovery with respect to his *Brady* claim pursuant to the Superior Court Rules Governing Proceedings Under D.C. Code § 23-110.

## I.

At around 2:40 a.m. on May 26, 2000, Lorraine Jackson was shot in an alley in the 1800 block of D Street Northeast. She survived the shooting and identified

---

[1] The firearm convictions were for possession of a firearm during a crime of violence, carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition.

[2] *Bellinger v. United States*, 916 A.2d 199 (D.C. 2007).

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

appellant as her shooter. Appellant was arrested and charged with the shooting in October 2000. It took three trials to convict him. After the first trial, which ended with a hung jury on May 30, 2001, the Public Defender Service (PDS) moved in September 2001 to withdraw as appellant's counsel on account of a conflict of interest. The reason for this conflict—that another client of PDS could be linked to the gun used in the shooting of Jackson—allegedly was not revealed until sometime later, and it is at the heart of appellant's present claims. The trial court granted PDS's motion and appointed Phyllis Baron to serve as appellant's new defense counsel. Baron represented appellant at his second trial, which also ended in a hung jury, and at his third trial, which concluded on April 5, 2002, with a jury verdict of guilty on all counts. After the verdict, new counsel entered their appearances for appellant and represented him at sentencing, on direct appeal, and in connection with his post-conviction challenges, as more fully discussed below.

## A. The Evidence at Trial

Lorraine Jackson testified that she had known appellant since approximately 1997. He had lived with her and her children for a period of about six months, and she continued to see him almost every day. A week before the shooting, appellant approached Jackson and told her that people in the neighborhood said she was

"snitching" to the police. Appellant asked Jackson if that was so and she denied it. Appellant said "okay" and walked away, but his inquiry worried Jackson because she "kn[e]w how he felt about people and snitching"; she had heard him say things like "snitches get stitches."

Jackson in fact had been giving information to the police. Sometimes she did so without receiving anything in return, but she also worked as a paid confidential informant, providing information about drug dealing even though she was using drugs herself.

Jackson testified that on May 24, 2000, two days before her shooting, she called the police and reported that appellant and another person were playing with guns in front of a building in the 400 block of 18th Street Northeast. Appellant and others fled when the police arrived to investigate, and no arrests were made. After the police departed, appellant returned and asked Jackson why she did not flee with everyone else when the police showed up. Jackson responded that she did not need to leave because she had not done anything. The look appellant gave her left Jackson concerned that he suspected her of having reported him to the police.

On May 25, 2000, the day before the shooting, Jackson started smoking crack cocaine around noon. She then slept for about twelve hours and, after

waking up, went out to purchase another $10 worth of crack cocaine. As she walked up 18th Street on the way to buy the drugs, she saw appellant and his friend Ed talking near a car. After making her intended purchase, Jackson headed to her friend Wanda's apartment in the 1800 block of D Street Northeast, where she intended to smoke the crack cocaine.

Upon entering the alley behind Wanda's building to get to its rear entrance, Jackson saw someone walking toward her from the opposite end of the alley. From a distance, she testified, she recognized that the person approaching her was appellant by "the way he was built and his walk and everything." Jackson then saw and recognized appellant's visage when he passed under a streetlight in the middle of the alley, where the two met "face to face." At that moment, Jackson testified, appellant pulled out a gun and started shooting at her. Jackson was wounded in the back, neck, arm, and legs, and fell to the ground. As appellant then ran from the alley, she yelled after him, "That's all right. At least I know who you are."[4]

---

[4] This account was corroborated at trial by the resident manager of the building where Jackson had purchased her crack cocaine. The witness, who knew Jackson and recognized her "distinctive" voice, testified that he heard the gunshots from his bedroom window and then heard Jackson yell out, "I know who you are."

Once appellant was gone, Jackson made her way to the front of Wanda's apartment building. When police arrived there soon afterward, she told them it was "Kevin" who shot her. Jackson said he shot her "out of fear that she was going to talk to the police." She also told the police they probably could find Kevin at the liquor store on Bladensburg Road with her niece, "Pooh."

When the police later presented Jackson with a photo array, she immediately selected appellant's picture, saying she was "just as sure as [she] know[s] [her] own mother and [her] children" that appellant was the one who shot her. At trial, Jackson testified that she was sure appellant was the person who shot her because she had "looked right in his face."

Jackson's niece "Pooh," whose real name was Satira Shank, testified at trial that she and appellant were like "real sisters and brothers." Prior to trial, Shank had appeared before the grand jury and adopted, under oath, a signed statement she had given investigators in which she said that appellant told her he shot Jackson because she "called the police on people." When Shank denied this at trial, her grand jury testimony and statement were admitted to impeach her and as substantive evidence.

The jury also learned that the police recovered four cartridge shell cases at the spot in the alley where Jackson was shot. A police firearms examiner identified them as four "9 mm Luger cartridge cases, Winchester brand," and concluded that they had been fired by the same gun. The gun itself was not introduced in evidence and had not been found.[5]

Appellant presented an alibi defense. Three friends testified that appellant was with them on the night of the shooting at a club on Bladensburg Road. One of these alibi witnesses, Douglas Quander, testified that he and appellant were at the club until 2:30 a.m., and that he then dropped off appellant and his friend "Ed" at the home of appellant's girlfriend.[6] Another defense witness, Christina Giles, testified that Jackson told her that her assailant's face was covered.

---

[5] The government also presented testimony that police noticed a car (which turned out to have been stolen) traveling away from the area of the shooting at a high rate of speed without its lights on. The police followed this car to a parking lot. They did not see anyone exit the vehicle, but thereafter they saw two men coming from its vicinity, one of whom appeared similar in physical description to the man Jackson had described as her assailant. The two men were seen going into an apartment building and entering an apartment on the top floor, which (the police later determined) belonged to appellant's second cousin. After a short while, the police were admitted to the apartment. Appellant was not present there. There was a rear exit the officers had not secured.

[6] Jackson, who had testified that she saw appellant with Ed near the alley on her way to buy the crack cocaine, also testified that she saw Quander and a second man standing across the street when she left the alley after being shot.

**B. Appellant's Collateral Challenge**

Prior to appellant's sentencing, Jenifer Wicks replaced Ms. Baron as appellant's defense counsel. On August 7, 2002, Ms. Wicks filed an *ex parte* motion seeking access to certain firearms and ballistics evidence in the possession of the Metropolitan Police Department. In pertinent part, the motion represented that appellant's first defense counsel, a PDS attorney, had moved to withdraw in September 2001 because of a conflict of interest between appellant and another PDS client named Randall Mack. According to the motion, the basis of this conflict (not disclosed to the court when PDS moved to withdraw) was that "the defense had learned" that a gun recovered in the arrest of Mack on July 21, 2000, and linked by police ballistics analysis to a homicide committed on July 7, 2000, "should match" the gun that fired the four cartridge cases found at the scene of the Jackson shooting six weeks earlier. The motion proffered, in addition, that the two shootings were "in the same area"; that Mack was "a known drug dealer" in the neighborhood of 18th and D Streets Northeast with "an apparent proclivity for violence and weapons possession"; and that Mack was acquainted with Jackson and knew she was an informant. Concluding that a match between Mack's weapon and the gun used in the Jackson shooting might enable appellant to advance a third-party-perpetrator defense, the motion requested the court to order the

Metropolitan Police Department to make the firearm and ballistic evidence in the two cases available for testing by a defense ballistics expert. The trial court granted the motion on August 9, 2002.

Appellant's expert, John Dillon, did not receive the requested evidence for testing until sometime in 2006.[7] In a report dated November 8, 2006, he opined that there was a match: the four shell casings found at the scene of Ms. Jackson's shooting on May 26, 2000, were fired from the handgun used in the July 7, 2000, shooting, that the police recovered from Mack on July 21, 2000.

Five years later, on November 4, 2011, appellant filed his motion for a new trial alleging, *inter alia*, that his trial counsel, Ms. Baron, had been ineffective in failing to investigate the ballistics match and use it to present a third-party-perpetrator defense, and that the government had violated its obligations under *Brady* by failing to disclose the ballistics match.[8]

---

[7] It appears that additional motions and proceedings were required to dislodge the evidence. In the meantime, appellant's present counsel had entered their appearance on his behalf, succeeding Ms. Wicks.

[8] In addition to seeking a new trial on those constitutional grounds pursuant to D.C Code § 23-110, appellant presented a claim of actual innocence under the Innocence Protection Act (IPA), D.C. Code § 22-4135. He has not asserted any

*(continued…)*

Relying in part on information set forth in the opinion of this court in *Andrews v. United States*,[9] appellant proffered that on July 21, 2000, the police recovered the two 9mm semi-automatic pistols, a Glock and a Bryco, that were used (according to a July 2000 police firearms examiner's report) in the murder of Deyon Rivers at 18th and C Streets Northeast on July 7, 2000. The ultimately convicted perpetrators of this homicide were two men named Patrick Andrews and Randall Mack.[10] Police recovered the Glock from Andrews's automobile, and the Bryco from Mack when he attempted to discard it during the course of his arrest. After being taken into custody, Mack claimed that Andrews had given him the Bryco and told him the gun was "hot."[11]

---

*(continued…)*
claim of error with respect to the trial court's denial of his IPA claim, however, so we do not address it further in this opinion.

[9] 922 A.2d 449, 453-54 (D.C. 2007).

[10] Andrews and Mack were tried together for the murder of Rivers. On May 1, 2002, a jury found them each guilty of first-degree murder while armed and the related firearm possession offenses. In *Andrews v. United States*, *supra*, this court affirmed Andrews's convictions, but granted Mack a new trial. After his re-trial resulted in a hung jury, Mack pleaded guilty to second-degree murder.

[11] A friend of Mack and Andrews named David Braddy later testified to having seen them with the guns frequently before the murder of Rivers.

Per the November 2006 ballistics report obtained from Mr. Dillon, the Bryco obtained from Mack was the gun used by Jackson's assailant on May 26, 2000. This conclusion was corroborated by police crime scene reports showing that some of the cartridge cases found at the scene of the Rivers shooting were the same brand as those found at the scene of the Jackson shooting.

In an affidavit accompanying his new trial motion, appellant stated that PDS never told him what the conflict of interest was that required his original trial attorney to withdraw. Appellant did not then know that PDS lawyers had "discovered" that Mack, who was also a PDS client, was accused of murdering someone with "the same firearm used to shoot Lorraine Jackson, in the same neighborhood, during the same time period." However, appellant averred, after Ms. Baron was appointed to represent him, she told him prior to his second trial "that someone told her about a firearm from another shooting, namely, the Mack case, that could be linked to [appellant's] case." Appellant, who professed his innocence, hoped this information would exonerate him, and Baron assured him she would investigate the report of a ballistics match. But neither Baron nor her

investigator followed up on the report in any way.[12]  Instead, appellant stated, Baron told him, falsely, that the prosecutors refused to turn over any information about ballistics or matching firearms, and that the court had denied her motion to compel the disclosure of information about a ballistics match—a motion she actually had never filed.

The government opposed appellant's motion for a new trial. It did not dispute that the gun used to shoot Jackson was recovered from Mack.  It denied, however, that appellant's trial counsel had been constitutionally ineffective or that there had been a *Brady* violation.  The government argued, *inter alia*, that it had been prejudiced by appellant's five-year delay in presenting his ineffective assistance claim, because Baron's death (in October 2009) prevented the government from establishing what she knew and did.  The government further argued that the ballistics match had not been withheld from the defense because neither the prosecutors nor the police knew of the match.  In any event, the government contended, the ballistics match was not probative of appellant's innocence, because guns frequently were shared among members of the 18th and D

---

[12]  In a second affidavit appellant submitted to the court, Baron's investigator stated that he was not asked to do anything with respect to appellant's case except serve subpoenas.

Street Crew (a local gang with which Andrews and Mack allegedly were affiliated), and appellant therefore could not show either the prejudice required to support his claim of ineffective assistance or the degree of materiality required for a *Brady* violation.

In support of its contentions, the government submitted affidavits from (1) Assistant United States Attorney (AUSA) Glenn Kirschner, a homicide division supervisor who prosecuted Andrews and Mack for the murder of Rivers and thereafter participated in a joint FBI-MPD investigation of the 18th and D Street Crew; (2) Detective Norma Horne, who also was involved in that investigation; and (3 and 4) AUSA (now Associate Judge of the Superior Court) Jennifer Anderson and AUSA Diane Lucas, who were the prosecutors at appellant's second and third trials. The affidavits were offered to support the government's claims that neither the police nor the prosecutors knew of the ballistics match at the time of appellant's trials, and that the match did not exculpate appellant in light of the regularity with which guns were shared.

AUSA Kirschner averred that, "[a]fter consultation with relevant law enforcement agents, fellow AUSAs, and a review of the available records, I have no indication or recollection that there was any information linking the murder

weapons used by Patrick Andrews and Randall Mack in the murder of Deyon Rivers to the May 2000 shooting of Lorraine Jackson." Kirschner further stated that Andrews and Mack were members of the 18th and D Street Crew; that "information was developed" that members of the crew used "multiple communal guns," some of which were hidden in a compartment of a lamppost located at the intersection of 18th and D Streets Northeast; and that it was believed to be "common knowledge among" the crew members that "these guns were accessible and available to any crew member who needed a gun at any given time."

Detective Horne, the sole police affiant, asserted that the Metropolitan Police Department "protocol" is that investigators do not request ballistic comparisons "as a matter of course," but only when they have "specific reason to believe that some connection may be made to the case at hand." Detective Horne averred that, "[t]o [her] knowledge, no such evidence existed at the time" of appellant's trial. (Although her affidavit did not mention it, the parties appear to agree that Detective Horne had worked on appellant's case.) The detective also stated that "[d]uring the course of the investigation of the 18th & D Crew we learned from cooperating witnesses and informants that[] firearms utilized by the crew members change[d] hands constantly" in an effort "to foil law enforcement efforts to arrest the armed subjects."

AUSAs Anderson and Lucas each averred that they had no knowledge of any ballistics comparison of the guns used in the shootings of Jackson and Rivers and no reason to request such a comparison. The "mere fact" that another shooting occurred in the same area six weeks later would not have prompted them to ask for a ballistics comparison, they explained, given the high incidence of gun-related violence in the neighborhood of 18th and D Streets Northeast.

At a status hearing on appellant's motion, the government's counsel represented that he personally had gone through the government's files in appellant's case and in the Andrews and Mack case, and that no comparative ballistics testing had been done. In a subsequent supplemental pleading, appellant acknowledged that he had "no reason to doubt" that the prosecutors were not aware of any comparative ballistics testing or of information that, "in their minds," would have linked the Jackson and Rivers shootings. Nonetheless, appellant argued, that did not dispose of his *Brady* claim, because the law enforcement officials investigating the two shootings "had *every reason* to suspect a connection between the two events and to pursue those connections." (Emphasis by appellant.) While appellant admittedly could not yet "pinpoint specific exculpatory information contained in police files," he requested leave of court to propound "targeted discovery requests" to ascertain whether such information existed. Specifically,

appellant asked that the government be required to disclose all "reports, notes, and other materials prepared, requested, or obtained in connection with" the investigations of the two shootings; the memorandum of understanding between the FBI and the Metropolitan Police Department regarding their joint investigation of the 18th and D Street Crew; all police protocols relating to the handling of firearms evidence, firearms examination and ballistics testing, the conduct of joint law enforcement operations and of homicide and assault with intent to kill investigations; and the names of all law enforcement personnel who were involved in investigating the crew, criminal activity in the area of 18th and D Streets, Northeast, the Jackson shooting, or the Rivers homicide.

## II.

The trial court denied appellant's § 23-110 motion, without first holding an evidentiary hearing on his claims of ineffective assistance and *Brady* violation, in a written order issued on February 6, 2013. In the same order, the court rejected appellant's request to take discovery in aid of his *Brady* claim. Appellant contends that the court erred in each of these rulings. We review both the denial of his

claims without an evidentiary hearing and the denial of discovery for abuse of discretion.[13]

## A. Evidentiary Hearings on Motions Pursuant to D.C. Code § 23-110

While the decision whether to hold an evidentiary hearing on a § 23-110 collateral challenge to the constitutionality of a conviction is committed to the trial court's discretion, the extent of that discretion is "quite narrow."[14] The statute itself states that the court "shall" grant a hearing "[u]nless the motion and files and records of the case *conclusively* show that the prisoner is entitled to no relief."[15] Thus, we have emphasized, "[a]ny question regarding the appropriateness of a hearing [on a §23-110 motion] should be resolved in favor of holding a hearing."[16] We "will affirm the trial court's denial of a § 23-110 motion without a hearing only if the claims (1) are palpably incredible; (2) are vague and conclusory; or (3) even

---

[13] *See Long v. United States*, 910 A.2d 298, 308 (D.C. 2006) (denial of a hearing); *Metts v. United States*, 877 A.2d 113, 123 (D.C. 2005) (denial of discovery in connection with a §23-110 motion).

[14] *Long*, 910 A.2d at 308.

[15] D.C. Code § 23-110 (c) (emphasis added).

[16] *Newman v. United States*, 705 A.2d 246, 261 (D.C. 1997) (internal quotation marks omitted).

if true, do not entitle the movant to relief."[17]   Under the last of those three categories, "if no genuine doubt exists about the facts that are material to the motion, the court may conclude that no evidentiary hearing is necessary."[18] However, in reviewing a summary denial, "we must be satisfied that under no circumstances could the petitioner establish facts warranting relief."[19]   Where this issue turns on questions of witness credibility, "we have consistently held that credibility determinations cannot be based on affidavits or countered by conclusory statements but may be resolved only by recourse to a full evidentiary hearing."[20]

## B.  Ineffective Assistance of Counsel

To prevail on his ineffective assistance claim, appellant needed to show that his trial counsel's representation was deficient, and that her deficient performance prejudiced his defense.[21]   The deficiency prong calls for a showing that counsel's performance "fell below an objective standard of reasonableness," a standard

---

[17]  *Id.* (internal quotation marks omitted).

[18]  *Ginyard v. United States*, 816 A.2d 21, 38 (D.C. 2003).

[19]  *Long*, 910 A.2d at 308 (internal quotation marks omitted).

[20]  *Newman*, 705 A.2d at 261 (citing cases).

[21]  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

established by reference to "prevailing professional norms."[22] The prejudice prong requires a showing that counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[23] "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. . . . The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."[24] It suffices to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"; in other words, "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[25] The term "reasonable probability" is not subject to

---

[22] *Id*. at 688.

[23] *Id.* at 687.

[24] *Id.* at 693-94.

[25] *Id*. at 694-95. Where, as here, the putative error is an investigative omission resulting in counsel's failure to discover evidence favorable to the defense, the prejudice inquiry has a dual aspect: "We must inquire, first, whether there is a reasonable probability that a competent attorney, aware of the favorable evidence, would have introduced it at trial in an admissible form; if so, then we must ask whether, had the jury been confronted with this evidence, there is a reasonable probability that it would have returned with a different verdict." *Cosio v. United States*, 927 A.2d 1106, 1132 (D.C. 2007) (en banc) (internal quotation marks, brackets and ellipses omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 535-36 (2003)).

precise quantification; the Supreme Court defined it in *Strickland* as simply "a probability sufficient to undermine confidence in the outcome."[26]

### 1. Deficient Performance

Appellant claimed that his trial counsel, Ms. Baron, unreasonably failed to investigate evidence that would have helped exonerate him. Specifically, appellant averred under oath (1) that Baron told him she had learned the gun used to shoot Jackson could be identified as the gun someone else (Randall Mack) used to commit another shooting in the same neighborhood at around the same time[27]; (2) that Baron inexplicably failed to investigate this information after assuring him that she would; and (3) that Baron lied to him to cover up her failure to investigate. Appellant professed to base these averments on his personal knowledge, i.e., his own interactions with Baron. The averments were corroborated by, among other things, his investigator's affidavit; PDS's withdrawal as appellant's counsel on conflict of interest grounds because (as Wicks, appellant's third attorney, represented in her 2002 *ex parte* motion for access to the ballistics evidence) it had

---

[26] *Id.* at 694.

[27] It is unclear from appellant's affidavit whether he claims that Ms. Baron actually knew Mack's identity or the particulars of the other shooting.

learned that Mack's gun had been used in the Jackson shooting; the evidence adduced in the prosecution of Mack and Andrews for the shooting of Rivers, including the testimony linking Mack to the gun around the time of the Jackson shooting; and the subsequent, undisputed confirmation of a ballistics match.[28] Had Ms. Baron investigated and obtained evidence that Mack had possessed and used the weapon, she would have been able to present it at appellant's trial in support of a third-party-perpetrator defense to supplement his alibi defense.[29] The unjustified failure of counsel to conduct reasonable investigation into evidence that would shore up the defense is a classic form of constitutionally deficient performance.[30]

It cannot be maintained that appellant's claim of deficient performance by his trial counsel was, on its face, palpably incredible, vague and conclusory, or insufficient, even if true, to entitle him to relief. Nor was this an issue as to which

---

[28] The fact that Ms. Wicks learned as early as 2002 why PDS had a conflict of interest would seem to enhance the likelihood that Ms. Baron had learned of it too.

[29] *See Winfield v. United States*, 676 A.2d 1, 4-5 (D.C. 1996) (en banc) (holding that to be relevant and admissible, third-party-perpetrator evidence need only "tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense.").

[30] *See Cosio*, 927 A.2d at 1123-27; *see also, e.g.*, *Kigozi v. United States*, 55 A.3d 643, 651 (D.C. 2012) ("[C]ounsel's arbitrary or ill-considered decision to forgo relevant pre-trial investigation is constitutionally deficient.").

the court could forgo taking evidence because there was no genuine doubt as to the material facts. Although the government did not dispute the ballistics match or Mack's possession of the gun used in the Jackson shooting, it did not concede appellant's allegations about Ms. Baron's conduct. A hearing at which appellant could have testified and presented whatever supporting evidence he could muster would have allowed the judge, as trier of fact, to assess whether appellant was telling the truth about Ms. Baron.

The trial court gave three reasons for ruling, without holding an evidentiary hearing, that appellant did not make a sufficient showing that Baron's representation fell below an objective standard of reasonableness. First, the court reasoned that the credibility of appellant's claim was weakened by his prolonged delay in filing his motion for a new trial and the prejudice to the government from the consequent unavailability of his trial counsel. Second, the court took into account Baron's otherwise effective representation at trial, noting in particular that appellant's second trial resulted in a jury hung 10-2 in favor of acquittal and that Baron performed well overall at his third trial (at which he was convicted).[31]

---

[31] The judge, who presided over both the trial and the § 23-110 motion, noted that Baron filed motions to suppress evidence; "conscientiously prepared for trial and was a vigorous advocate during the proceedings;" made "an effective

*(continued…)*

Third, the court reasoned that even if counsel knew of a potential ballistics match, she could have made a strategic decision not to use that information at trial because "any attempt to prove Andrews and Mack [were arrested with the gun used to shoot Jackson] would have inevitably opened the door" to the government's introduction of evidence of appellant's "affiliation with the 18th & D Crew and their proclivity to share weapons."

These reasons do not suffice to justify rejection of appellant's claim without affording him an evidentiary hearing. As to the first reason given by the trial court, we have held that where a claim is sufficiently plausible on its face to justify an evidentiary hearing, even a delay of many years in presenting the claim is not a sufficient ground for *summarily* denying it. Rather, the court "in conducting an evidentiary hearing . . . , may consider the length of [the] delay . . . , any excuses for that delay, and any resulting prejudice to the government as factors bearing on the credibility" of the claim.[32] In addition, by virtue of a laches provision added to

---

*(continued…)*
opening statement" and "a thoroughly competent closing argument"; and "professionally cross-examined government witnesses."

[32] *Ramsey v. United States*, 569 A.2d 142, 148-49 (D.C. 1990); *see, e.g.*, *Dobson v. United States*, 711 A.2d 78, 84 (D.C. 1998) (hearing required despite defendant's eleven-year delay in presenting ineffectiveness claim); *cf. Stewart v. United States*, 37 A.3d 870, 873-75 (D.C. 2012).

D.C. Code § 23-110 in 2009, the court is empowered to dismiss the motion for relief "if the government demonstrates that it has been materially prejudiced in its ability to respond to the motion by the delay in its filing, unless the movant shows that the motion is based on grounds which the movant could not have raised by the exercise of reasonable diligence before the circumstances prejudicial to the government occurred."[33] The trial court did not cite this provision in its order and did not find that the government had demonstrated material prejudice to its ability to respond to appellant's motion. It concluded only that the government was "disadvantaged by the delay, as counsel became unavailable." We think the trial court needed to hold an evidentiary hearing to determine the applicability of this provision to appellant's motion; it was not enough that the government merely claimed in its opposition pleading to have been prejudiced.

As to the trial court's second reason, counsel's otherwise capable representation is not a sufficient basis for concluding that a particular omission— i.e., her alleged failure to conduct appropriate investigation—did not amount by itself to constitutionally deficient performance. "[I]t has long been the rule that counsel's investigation before trial is an essential component of effective

---

[33] D.C. Code § 23-110 (b)(2).

representation and can be as important to the defense as counsel's performance during trial."[34]  And it is well-settled that "the type of breakdown in the adversarial process that implicates the Sixth Amendment is not limited to counsel's performance as a whole—specific errors and omissions may be the focus of a claim of ineffective assistance as well."[35]

Finally, as we explained in *Cosio*, "[d]eficient investigation cannot be excused on the ground that a competent attorney, aware of the evidence that an adequate investigation would have uncovered, *could* have made an informed judgment to pursue an alternative strategy and not utilize that evidence at trial."[36] "[I]n assessing the alleged shortcomings of the investigation performed by appellant's trial counsel in the present case, the issue 'is not whether counsel should have presented' at trial the evidence that ought to have been discovered. Rather, we must 'focus on whether the investigation supporting counsel's decision not to introduce such evidence *was itself reasonable*.'"[37] In other words, the

---

[34] *Kigozi*, 55 A.3d at 650-51.

[35] *United States v. Cronic*, 466 U.S. 648, 657 n.20 (1984).

[36] *Cosio*, 927 A.2d at 1126.

[37] *Id.* at 1125-26 (internal citations, brackets and ellipses omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (emphasis in the original)).

relevant question is whether it was objectively reasonable for appellant's counsel to forgo investigating the reported ballistics match.[38] The trial court did not address this question. In our view, the record in its current state does not enable the court to find that the alleged failure to investigate was objectively reasonable.[39]

For these reasons, we hold that the trial court erred in ruling that counsel's performance was not deficient without having afforded appellant an evidentiary hearing on the question.

## 2. Prejudice

The trial court ruled in the alternative that appellant had not demonstrated the requisite likelihood of prejudice. The evidence identifying appellant as

---

[38] In answering that question, a court must be careful "not to slap the label of objective reasonableness on fanciful or unrealistic rationalizations for an attorney's conduct." *Id.* at 1127.

[39] Moreover, as we proceed to discuss, at least in its current state, the record does not clearly support the court's assumption that the government could have introduced rebuttal evidence of appellant's affiliation with the 18th and D Street Crew.

Jackson's assailant was "compelling,"[40] the court reasoned, while the ballistics evidence was "weak" and "not dispositive exculpatory evidence because of the communal nature of the guns used by defendant and his associates and the six-week lapse between the Jackson and Rivers shootings."

We agree that, if appellant had been able to introduce the comparative ballistics evidence at his trial and to present a third-party-perpetrator defense, the government might have been permitted to introduce rebuttal evidence that the gun used in the Jackson and Rivers shootings was shared among the members of the 18th and D Street Crew, and that appellant was a member of that crew. However, the government's proffer to the trial court in opposition to appellant's ineffective assistance claim did not sufficiently show what, *if any*, admissible evidence the government would have had at its disposal at the time of appellant's trial to establish those facts. None of the affidavits submitted by the government linked appellant to the 18th and D Street Crew, and they contained only vague hearsay statements regarding the sharing of weapons by members of that crew (e.g., AUSA Kirschner's statements that "information was developed" about such sharing and it

---

[40] The court cited Jackson's long familiarity with appellant and her prompt identification of him, and the circumstantial evidence corroborating her account—in particular, the testimony of the witness who heard Jackson yell that she knew who the shooter was.

was "common knowledge"). On the record before it, the court could not say with any confidence what rebuttal evidence would have been available to the government. One purpose of an evidentiary hearing would have been to answer this question.

We respect the trial judge's first-hand assessment of the strength of the identification evidence presented at appellant's third trial. But the case was not one-sided—appellant did present an alibi defense—and it is striking that the jury hung in the two previous trials, 6-6 in the first and then 10-2 *for acquittal* in the second. To be sure, there were differences in the evidence presented at the three trials; notably, the witness who heard Jackson yell in the alley after being shot did not testify in either of the first two trials, and Satira Shank did not testify in the second of them. But these differences are not so great that we can dismiss the results of the first two trials entirely; at a minimum they indicate that the government's case was not without its weaknesses.[41]

---

[41] There was, we note, no physical or forensic evidence pointing to appellant as Jackson's assailant, and the jury might have had reasons to be dubious of Jackson's credibility.

Without a record and findings as to the rebuttal evidence the government actually could have introduced, we cannot say there is no reasonable probability that the outcome of appellant's third trial would have been different had his counsel presented the ballistics comparison.

We conclude that the existing record does not provide an adequate basis for disposing of appellant's ineffective assistance of counsel claim, and that the trial court erred in rejecting that claim without holding an evidentiary hearing focusing on the credibility of appellant's assertions and how the government might have rebutted ballistics match evidence had it been presented at appellant's trial.

## C. Suppression of Evidence Favorable to the Defense

We reach a different conclusion with respect to the trial court's denial, without taking evidence, of appellant's *Brady* claim that the government withheld evidence and information pertaining to the ballistics match from him in violation of his constitutional right to due process. An evidentiary hearing was not required on this claim because, as the trial court held, appellant was unable to proffer

evidence that the government suppressed any exculpatory evidence or information in its possession.[42]

In *Brady v. Maryland*, the Supreme Court recognized that the government has a constitutional obligation to disclose material evidence in its possession that is favorable to the accused.[43]   This obligation exists "whether the evidence was actually known by the individual prosecutor, or merely by "others acting on the government's behalf in the case, including the police."[44]   Thus, to establish a *Brady* violation, a defendant must show not only that the information was favorable to his defense and material to the question of guilt or punishment, but also that the

---

[42]   This was one of two alternative grounds on which the trial court rejected appellant's *Brady* claim.   The court also ruled that the ballistics match was not materially exculpatory for the same reasons it found no *Strickland* prejudice from counsel's failure to investigate and use the match at trial.   *See Miller v. United States*, 14 A.3d 1094, 1115 (D.C. 2011) (evidence is material within the meaning of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.") (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).   As we have explained, we think the court needed to hold an evidentiary hearing to properly decide this prejudice/materiality question.

[43]   373 U.S. 83, 87 (1963); *see generally Turner v. United States*, 116 A.3d 894, 914-15 (D.C. 2015).

[44]   *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) ("[T]he rule encompasses evidence 'known only to police investigators and not to the prosecutor.'").

information was actually in the government's possession and was suppressed, either willfully or inadvertently.[45]

"[W]hether a defendant has established a violation by the government of its obligations under *Brady* presents a mixed question of fact and law."[46] We review the trial court's factual conclusions under the clearly erroneous standard, but we review its legal conclusions *de novo*.[47]

Appellant argues that the trial court, in denying his *Brady* claim based on the government's affidavits and without a hearing, was "too narrowly focused on whether the prosecutors were aware of, and actually possessed, a comparative ballistics test."[48] But while the requirements of *Brady* certainly do extend beyond the files and knowledge of the individual prosecutors, appellant could not proffer that *anyone* acting on behalf of the government, including anyone in the employ of the Metropolitan Police Department or the FBI, possessed information (from

---

[45] *See Vaughn v. United States*, 93 A.3d 1237, 1254 (D.C. 2014).

[46] *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011) (internal quotation marks omitted).

[47] *Id.*

[48] Brief for Appellant at 27.

testing or otherwise) that the gun recovered from Mack and used in the Rivers shooting was the same gun used in the apparently unrelated Jackson shooting.[49]

Unable to show the government's actual possession of this exculpatory information, appellant argues that he need not do so to establish a *Brady* violation because the clues were there that should have led the government to investigate the possibility of a ballistics match between the two seemingly unrelated shootings. That is to say, in the wake of the Rivers shooting, the recovery of the guns used to commit that shooting from Mack and Andrews, and Mack's statement that his gun was "hot," the police had sufficient reason, appellant argues, to check whether the same guns could be linked through a ballistics match to any other recent shootings in the same area. Had the police conducted such investigation, appellant urges, they *would have* learned of the ballistics match between Mack's gun and the gun used in the Jackson shooting. *Brady*'s disclosure requirements must extend to the evidence of that match, appellant argues, because the prosecution has the recognized "duty to learn of any favorable evidence known to the others acting on

---

[49] Nor has appellant alleged that the police or other government actors were willfully blind to the possibility of a ballistics match.

the government's behalf,"[50] and to search police files if there is a sufficient "prospect" that they contain "exculpatory materials."[51]

But having clues that, if pursued, could have led to the discovery of exculpatory evidence or information is not the same thing as actually having the exculpatory evidence or information in hand. "If the government does not possess the requested information, there can be no *Brady* violation."[52] *Brady* "does not imply the government's duty to investigate—and come to know—information which the defendant would like to have but the government does not possess."[53]

---

[50] *(Anthony N.) Robinson v. United States*, 825 A.2d 318, 328 (D.C. 2003) (quoting *Kyles*, 514 U.S. at 437).

[51] *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992).

[52] *Guest v. United States*, 867 A.2d 208, 212 (D.C. 2005); *accord O'Brien v. United States*, 962 A.2d 282, 316 (D.C. 2008) ("*Brady* applies only to information in the government's possession.").

[53] *Guest*, 867 A.2d at 212 (internal quotation marks and brackets omitted); *see also O'Brien*, 962 A.2d at 316 (rejecting a *Brady* claim because the potential impeachment information was not known to the government, and *Brady* does not impose an obligation to search for information outside the government's possession); *Reyes v. United States*, 933 A.2d 785, 794 (D.C. 2007) (finding no *Brady* violation where the police failed to take identifying information from a cashier that might have impeached the complainant because that information was not in the government's possession and there was no duty to investigate information the defendant "might like to have."); *Malloy v. United States*, 797 A.2d 687, 689 n.3 (D.C. 2002) (holding that *Brady* did not require the government to make impressions of a bite mark on the complainant's breast, even if such

*(continued…)*

The evidence and information the government actually had in its possession in this case was not favorable to appellant on its face; moreover, so far as appears, no one acting on the government's behalf knew that further forensic investigation might develop exculpatory evidence. So appellant's proffer did not show any unconstitutional suppression of evidence favorable to his defense; "[t]he government cannot have disclosed to the defense what it did not know itself."[54]

Accordingly, no evidentiary hearing was required on appellant's *Brady* claim in the posture it was in at the time the trial court ruled on it. As we proceed to discuss, however, the court may have to revisit this ruling in the event limited additional discovery by appellant succeeds in uncovering evidence of a *Brady* violation.

---

*(continued…)*
imprints would have shown that the defendant's unique teeth could not have caused the injury, because the government was not required to "create such evidence").

[54] *(Michael) Robinson v. United States*, 50 A.3d 508, 520 (D.C. 2012).

## D. *Brady* Discovery

Although appellant did not proffer that he could prove the government suppressed an exculpatory ballistics match, he did ask the court to allow him to propound discovery requests for evidence supportive of his *Brady* claim. The court declined to authorize the proposed discovery, finding *inter alia* that the requests were overly broad, speculative, and unlikely to uncover evidence of a *Brady* violation. Moreover, having rejected appellant's *Brady* claim on its merits—"most importantly," as the court said, because it found the ballistics evidence would not have been materially exculpatory—the court found that appellant had not shown good cause to take discovery regarding the government's compliance with its *Brady* obligations. Appellant contends that the trial court erred in so ruling.

Rule 6 of the Superior Court Rules Governing Procedures Under D.C. Code § 23-110 permits a movant to take post-conviction discovery where "the judge in the exercise of his or her discretion and for good cause shown grants leave to do so, but not otherwise." The trial court should permit discovery "where specific allegations before the court show reason to believe that the prisoner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is

therefore entitled to relief."[55]  We review a denial of post-conviction discovery for abuse of discretion.[56]

We perceive no abuse of discretion in the trial court's ruling here.  We agree with the court's characterization of appellant's requests as overly broad and speculative.  The requests were designed not to elicit evidence that the government actually possessed information about the ballistics match, which would have been an appropriate discovery aim, but rather to obtain evidence of the government's negligence in failing to investigate a possible match.  Discovery for this purpose was properly denied because, as we have explained, appellant would not be entitled to relief even if he could prove such negligence.

We do not wish, however, to foreclose appellant from requesting leave on remand to propound narrower discovery requests focusing on whether the government actually did possess, and withhold from appellant, information linking the gun used in the Jackson shooting to the gun used in the Rivers shooting and recovered from Mack.  We appreciate that the trial court found no suppression of

---

[55] *Brown v. United States*, 726 A.2d 149, 156 (D.C. 1999) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1968)).

[56] *Id*.

such evidence based on the affidavits from the prosecutors who tried both cases and a detective who participated in the investigation of appellant's case, and the oral representations of government counsel at a status hearing on appellant's new trial motion. Yet there was a potentially concerning gap in those submissions—while they sufficiently establish that the prosecutors had no information about a ballistic match, they say almost nothing about whether the police possessed such information. The affidavits are silent as to whether the relevant files of the Metropolitan Police Department were searched, or whether any police personnel who worked on the Rivers case or who performed firearms examinations were asked what they knew about a possible ballistics match. These seem like rather glaring omissions since, if anyone acquired such information or developed such evidence, it presumably would have been those personnel.

We do not think it entirely speculative that the police might have matched the gun recovered from Mack to the gun used in the Jackson shooting. Even setting aside the fact that PDS evidently learned of the match prior to appellant's second trial (probably from a source other than the government, but who really knows?), it is certainly plausible that the police would have thought to investigate whether a gun described as "hot" had been used in other recent shootings in the same vicinity (particularly if, as has been asserted, appellant himself was linked to

Andrews and Mack and the 18th and D Street Crew). While Detective Horne stated in her affidavit that the MPD protocol is not to request ballistic comparisons "as a matter of course," but only when there is "specific reason to believe that some connection may be made to the case at hand," there arguably was "specific reason" to check out Mack's "hot" gun in that fashion. And while Detective Horne stated that no ballistics comparison had been performed at the time of appellant's trial "[t]o [her] knowledge," it is unclear what, if any, inquiry she made before making that statement.

On remand, the trial court may find it appropriate for appellant to take limited discovery with respect to these particular matters. Should such discovery bear fruit, the court will be able to reconsider its denial of appellant's *Brady* claim.

## III.

For the foregoing reasons, we remand for the trial court to hold an evidentiary hearing on appellant's ineffective assistance of counsel claim, and for other further proceedings consistent with this opinion.

*So ordered.*

FARRELL, *Senior Judge*, concurring: I agree with the decision to require an evidentiary hearing, but with considerable skepticism that it will establish anything sufficient to change the outcome of the case. Even if it becomes clear on remand that trial counsel (Ms. Baron) was deficient under *Strickland* in not confirming the ballistics match we now know existed, and it likewise is shown (relative to appellant's *Brady* claim) that MPD personnel knew of the match, I have substantial doubt that appellant would succeed in showing *Strickland* prejudice or *Brady* materiality, that is, that there is a reasonable probability that had the jury learned that Mack or Andrews used the same handgun to kill Deyon Rivers six weeks after the shooting of Lorraine Jackson, in the same neighborhood, it would have returned a different verdict.

The issue of prejudice or materiality does not turn on whether the ballistics match if known would have been admissible at appellant's trial. Evidence that someone else used the instrumentality of the charged crime in roughly the same time period would surmount the minimal threshold of relevance, and might also withstand lenient application of the test for admitting third-party culpability evidence, *see Winfield v. United States*, 676 A.2d 1 (D.C. 1996) ( en banc). But a "reasonable possibility," *id.*, that someone else committed the crime is not a reasonable probability that he did so, as the Supreme Court emphasized in

*Strickler v. Greene*, 527 U.S. 263, 289, 291 (1999). As I understand appellant's proffer to date, the ballistics match has been accompanied by no claim that Mack or Andrews had a motive to shoot Jackson, had a particularized opportunity to confront her at the time she was shot, or even knew her or were known to her. All this is in strong contrast, for example, to the corroborative testimony of the building manager who heard Jackson yell to her assailant, "I know who you are," and of Satira Shank to whom appellant admitted shooting Jackson because she was a snitch. Mack's possession of the same gun six weeks later, which said nothing about whether he possessed it at the time Jackson was shot, "*might* have changed the outcome of the trial" to a jury learning of it, but that "is not the standard that [appellant] must satisfy in order to obtain relief." *Strickler*, 527 U.S. at 289 (emphasis added). In light of Jackson's unequivocal, corroborated identification, I find it exceedingly hard to say that a jury apprised of the ballistics match and little or nothing more "could reasonably [have] taken [that evidence] to put *the whole case* in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (emphasis added).

I nonetheless agree with the remand, for two reasons. First, the evidentiary hearing should remove any residual unclarity as to what if anything, beyond the ballistics match, appellant is able to present as a link between Mack and Andrews

and the Jackson shooting.  And second, in arguing the lack of *Strickland* prejudice and *Brady* materiality so far, the government has relied heavily on proffered rebuttal evidence that we are in no position yet to evaluate.  Its stated reason why the ballistics evidence "does not cast meaningful doubt on the verdict [is] because the government would have responded with damning evidence tying appellant to the murderers of Mr. Rivers" (Brief for Appellee at 37).  But, as the court points out, the nature and admissibility of that evidence has not been determined yet.  Thus, while I am not nearly so certain as the court is that "[w]ithout . . . the [admissible] rebuttal evidence . . . we cannot say there is no reasonable probability that the outcome of appellant's third trial would have been different had his counsel presented the ballistics comparison," *ante* at 28-29, I agree that resolution of the *Strickland* prejudice and *Brady* materiality issues should await the further development of the record.